# EXHIBIT A

1  DONALD J. PUTTERMAN (SBN 90822)
2  DANNIELLE M. CAMPBELL (SBN 303204)
   PUTTERMAN | YU | WANG LLP
3  345 California Street, Suite 1160
   San Francisco, CA 94104
4  E-mail: dputterman@plylaw.com
             dcampbell@plylaw.com
5
   Attorneys for Plaintiffs
6  JOHN DOE and ROBERT ROE

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**07/14/2023**
Clerk of the Court
BY: MARK UDAN
Deputy Clerk

7

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **COUNTY OF SAN FRANCISCO**

10                                                        **CGC-23-607672**

11 JOHN DOE, an individual; ROBERT ROE, an   Case No.:
   individual,
12                                            *[Conditionally Filed]*[1]
                Plaintiffs,
13                                            **COMPLAINT FOR DAMAGES FOR:**
          vs.
14                                            **(1)    PUBLIC DISCLOSURE OF**
   DEUTSCHE LUFTHANSA                                 **PRIVATE FACTS**
15 AKTIENGESELLSCHAFT, a German              **(2)    INTENTIONAL INFLICTION OF**
   corporation; LUFTHANSA GROUP BUSINESS            **EMOTIONAL DISTRESS**
16 SERVICES NEW YORK LLC, a Delaware limited **(3)    BREACH OF CONTRACT**
   liability company; and DOES 1-10, inclusive, **(4)    NEGLIGENT INFLICTION OF**
17                                                   **EMOTIONAL DISTRESS**
                Defendants.                   **(5)    LOSS OF CONSORTIUM**
18                                                   **(CIV. CODE § 1431.2)**
19

20

21

22

23

24

25

26

27

28  [1] *See Department of Fair Employment and Housing v. Superior Court of Santa Clara County* (2022)
    82 Cal.App.5th 105, fn.1

Plaintiffs JOHN DOE ("Doe") and ROBERT ROE ("Roe," collectively, "Plaintiffs") submit this COMPLAINT FOR DAMAGES ("Complaint") against Defendants DEUTSCHE LUFTHANSA AKTIENGESELLSCHAFT ("Lufthansa AG") and LUFTHANSA GROUP BUSINESS SERVICES NEW YORK LLC ("Lufthansa Group") (collectively, "Lufthansa") on the basis of personal knowledge and/or information and belief.

## **INTRODUCTION**

1.      Doe and Roe, a gay married couple, have had their lives upended and irreparably altered as a result of Lufthansa's actions during and following check-in for their May 25, 2021 flight from Riyadh, Saudi Arabia to San Francisco, California.  Lufthansa acted recklessly and with gross negligence when it publicly disclosed Doe and Roe's marital status and sexual orientation in the middle of the Riyadh airport without their consent and over their repeated protestations.  For the reasons explained in this Complaint, Doe and Roe, the real parties in interest, sue under these fictitious names because of the extreme risks posed by any further public disclosure of their identities, sexual orientation and marital status, and will apply to the Court for leave to proceed using these fictitious names.  Plaintiffs are informed and believe, and thereon allege, that the Defendants already are well aware of Doe's and Roe's identities, sexual orientation and marital status for the reasons described herein, and further, Doe and Roe will confidentially confirm their identities to Defendants after application for and entry of an appropriate Confidentiality and Non-Disclosure Order by this Court.  Consequently, there is no prejudice to Defendants in allowing Plaintiffs to proceed with this action using the fictitious Doe and Roe identities.

2.      This is not the typical data breach case in which the disclosure may create a minor bureaucratic hassle with minimal tangible or monetary losses for the affected individual.  Here, the loss is real and substantial.  Lufthansa knew, or recklessly disregarded, that its public and unauthorized disclosure that Roe (a Saudi Arabian citizen) and Doe (a United States citizen and California resident working in Saudi Arabia) are gay and married to one another would cause irreparable harm because homosexuality in Saudi Arabia is both a capital offense and an intolerable stigma on individuals and their families.  Lufthansa's actions have effectively exiled Roe from his

own country, and separated him from his family and loved ones.  He must now live apart from Doe for most of the year in order to ensure his and Doe's safety.

3.    Doe and Roe very discreetly live together in Saudi Arabia and are very private about their relationship, which is necessitated by Saudi Arabian attitudes, policies and laws concerning gay relationships.  Doe and Roe separately booked flights to travel to California. When Roe and Doe checked in as first-class passengers on their May 25, 2021 flight from Riyadh, Saudi Arabia to San Francisco, California they were prepared to discretely disclose their relationship to a single high-level Lufthansa employee for the limited purpose of complying with U.S. COVID-19 entry requirements for travelers from Saudi Arabia.  Instead of receiving the privacy and discretion that Lufthansa promotes in its terms of service and that it is required to meet as a data processor under the European Union's General Data Protection Regulation ("GDPR"), Roe and Doe's lives were upended when a high-ranking Lufthansa employee at the Riyadh airport publicly and vociferously degraded Plaintiffs and disclosed their marital status and sexual orientation to other Lufthansa employees and numerous nearby travelers.  Lufthansa's unauthorized, public disclosure of Roe's and Doe's sexual orientation placed a target on their backs in a country where homosexuality is a crime.

4.    As a result of Lufthansa's violations and reckless disregard of the foreseeable consequences of its violations, Roe and Doe now face real, enormous damages.  Roe remains unable to safely return to his home country of Saudi Arabia to live, conduct business, or to visit his family and friends.  He fears for the well-being and potential consequences to his family and friends. Lufthansa's violations therefore have led to a forceable restructuring of Roe and Doe's family life— Roe is now forced to remain in California and spend much of the year physically separated from Doe, whose job requires him to live in Saudi Arabia for most of the year and who faces a less severe risk of physical harm in returning to Saudi Arabia because he is a United States citizen, but now must fear economic consequences should he be unable to continue working in Saudi Arabia.  On top of this, Plaintiffs have suffered significant and immediate material, economic damages as result of Lufthansa's actions, including increased travel costs far into the future, legal fees to address Roe's immigration status in California (which is not yet settled), and lost profits suffered by Roe as a result of his exile due to the need to abandon his business in Saudi Arabia.

## PARTIES

5.      Plaintiff Robert Roe is a Saudi Arabian citizen and, prior to May 2021, was a resident of Saudi Arabia and frequently visited California.

6.      Plaintiff John Doe is a United States citizen, owns property in Moss Beach, California, and at all times mentioned in this Complaint was domiciled in California.

7.      Defendant Deutsche Lufthansa Aktiengesellschaft ("Lufthansa AG") is a corporation registered under the laws of Germany with its principal place of business in Germany.  Lufthansa AG operates flights between Saudi Arabia and California.  At all times mentioned in this Complaint Lufthansa AG has done (and continues to do) business in the United States, the state of California, and the county of San Francisco.  This Defendant has filed an information statement with the California Secretary of State, but has not qualified to do business in California and has not identified a head (or any) office within California.  A copy of its information statement filed with the Secretary of State is attached as **Exhibit A** hereto.

8.      Defendant Lufthansa Group Business Services New York LLC ("Lufthansa Group") is a limited liability company registered under the laws of Delaware with its principal place of business in New York.  Lufthansa Group provides business services for Lufthansa AG, including IT services.  At all times mentioned in this Complaint Lufthansa Group has done (and continues to do) business in the United States, the state of California, and the county of San Francisco.  This Defendant has filed an information statement with the California Secretary of State, but has not qualified to do business in California and has not identified a head (or any) office within California.  A copy of its information statement is attached as **Exhibit B** hereto.

9.      Defendants Does 1 through 10 are sued under fictitious names pursuant to Code of Civil Procedure section 474.  Plaintiffs are informed and believe, and on that basis allege, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of Defendant(s), and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of Defendant(s).

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this matter because Lufthansa does business in and has substantial contacts with the state of California and the County of San Francisco, and some of the events in question occurred in California.  Lufthansa targeted its business activities toward California, including by promoting and operating flights into San Francisco International Airport.

11.     Venue is proper in this county because the events giving rise to the causes of action in this Complaint occurred in connection with Plaintiffs' check in and flight from Saudi Arabia to San Francisco International Airport, where his last interaction with Lufthansa employees which is a subject of this complaint occurred.  These Lufthansa employees are therefore local witnesses.  Plaintiffs are also informed and believe that other Lufthansa flight crew members may be based in San Francisco.  Moreover, because neither Defendant has qualified to do business in California, venue as to each of them is proper in any county in California, including this county.

**FACTS COMMON TO ALL CAUSES OF ACTION**

A.     **Summary of the Parties and Plaintiffs' Relationship**

12.     Roe is a Saudi Arabian citizen who, until May 2021, was living full-time in Riyadh, Saudi Arabia and working as a real estate investor.  As of May 25, 2021, he was not a United States citizen, nor did he hold a U.S. green card permitting him to stay in the United States for extended periods of time.

13.     Doe is domiciled in California.  He lives much of the year in Riyadh, Saudi Arabia, where he is works for a company as legal counsel.

14.     Doe and Roe have been in a committed, but discreet, relationship for 33 years.  In 2013, they were legally married in California and have now been married for over nine years.

15.     Saudi Arabia does not recognize same-sex marriages such as Doe and Roe's marriage.  In fact, homosexuality can be, and has recently been treated as, a capital offense in Saudi Arabia.

16.     Doe and Roe have lived together in Saudi Arabia since 1989, but were forced to keep their relationship and sexual orientation hidden.  Living very carefully, they successfully kept their 33-year relationship a secret from the government, strangers, employers, friends, and family, alike.  This was a difficult and often dehumanizing feat, but both Doe and Roe recognized that it was a

CASE NO.

required step to their remaining safe and continuing to live and work in Saudi Arabia.  This is especially true for Roe, who, as a Saudi Arabian citizen, is more likely to be stripped of his passport, imprisoned, or even conceivably executed for his sexual orientation.

17.    On information and belief, the Saudi government has an extensive network of informants who will report any "deviant" or anti-regime activities to the government, as well as sophisticated monitoring of email and other electronic forms of communication.  The collection of such information is used by the Saudi government to protect the Royal family and eliminate dissidents.

**B.    Lufthansa's Terms of Service Includes Data Protection Information Promising Customers that it is Compliant with the European Union's GDPR**

18.    In order to access Lufthansa's website (www.lufthansa.com), users are greeted by a pop-up regarding Lufthansa's privacy settings, which includes a link to Lufthansa's "data protection and info" page and Lufthansa's cookie policy.  The pop-up also requires the customer to agree or disagree with Lufthansa's privacy policy and website cookie terms in order to continue on to the website.  When purchasing tickets on www.lufthansa.com, the customer is also asked to affirmatively click to "accept all terms and conditions," which again includes a link to Lufthansa's "data protection and info" information page.

19.    Lufthansa represents to its customers in its privacy policy that as a data processor based in the European Union, it "process[es] personal data in accordance with the provisions of the EU General Data Protection Regulation (GDPR) and the German Federal Data Protection Act (BDSG)."  This policy applies to all "Lufthansa Group airlines."  Lufthansa further claims that it "process[es] personal data to fulfill contractual obligations under the art. 6(1), sub. 1(b)" of the GDPR, including "managing check-in processes from check-in invitation, through the entry documents check" and "collecting and transmitting contact details required by the local authorities based on mandatory statutory regulations[.]"  The scope of data processing permitted under GDPR Article 6, subpart 1(b), is limited in relevant part to processing only information "necessary for the performance of a contract to which the data subject is party."  Lufthansa's privacy policy assures customers that its data, if transmitted, will be transmitted securely to the intended recipient.

**C.**    **<u>Lufthansa Unlawfully and Publicly Disclosed Plaintiffs' Sexual Orientation When They Checked in for Their May 25, 2021 Flight from Saudi Arabia to California</u>**

20.    The COVID-19 pandemic presented challenges for Doe and Roe.  The United States did not allow non-citizen travelers from Saudi Arabia into the United States for over a year.  This policy precluded Doe and Roe from traveling together to the United States because Roe is not a U.S. citizen.  Finally, in or around May 2021, the United States opened its borders to non-citizen travelers coming from Saudi Arabia if the traveler was the immediate family member of a United States citizen.

21.    Roe and Doe were excited by the prospect of returning to California together after not having been able to visit for over a year due to the United States' COVID-19 entry restrictions.  Doe and Roe booked round-trip, first-class airfare tickets through Lufthansa's website to fly to California with a layover in Frankfurt.  Doe and Roe booked their first-class tickets separately, as they always did, to avoid documenting their togetherness.  Doe and Roe specifically chose to fly with Lufthansa over Middle-East-based airlines because they reasonably expected that a German airline would be discreet in handling the confirmation of Doe and Roe's marital status for U.S. immigration entry requirements and would not share such information with the Saudi government.

22.    Doe and Roe arrived at the King Khalid International Airport in Riyadh, Saudi Arabia, on May 25, 2021.  When they reached the check-in desk, the Lufthansa check-in agent demanded that Roe, as a Saudi citizen, identify his familial relationship with a United States citizen as a condition to check in for his flight.

23.    Roe identified the most senior station agent Lufthansa had on duty—Deputy Station Chief Iqbal Jamshed ("Jamshed"), who Plaintiffs are informed and believe is a Pakistani Muslim.  To Plaintiffs' knowledge and belief, Jamshed was Lufthansa's most senior employee and agent at the King Khalid International Airport in Riyadh, Saudi Arabia at the time that they were checking in.  Roe reasonably believed that the most senior Lufthansa agent available would be the most likely employee present to be familiar with and understand the importance of following Lufthansa's touted privacy policies.  Unfortunately, the contrary proved to be true.

24.    Roe pulled Jamshed aside so that he and Jamshed were out of earshot from other passengers, workers, and passersby.  Discreetly and quietly, Roe told Jamshed that he and Doe were married.

25.    Immediately after sharing this sensitive information, Roe noticed a hostile shift in Jamshed's demeanor.  Jamshed declared, loudly enough so others around could hear, that he could not believe that Roe and Doe—two men, and one a Saudi Arabian citizen—were married.  This shocking, highly public chastising left Roe embarrassed and fearful.

26.    Doe approached Roe and Jamshed.  Doe showed Jamshed a copy of their marriage certificate to corroborate Roe's oral declaration that he and Doe were married.  The inquiry should have stopped there.  However, instead of accepting the document as true and allowing Roe and Doe to check in for their flight, Jamshed continued to publicly demean and question Plaintiffs about their relationship solely because they were gay.  Jamshed's performative stunt expressed and reflected discriminatory animus and homophobia—ideals which Lufthansa necessarily adopted when it employed and retained a high-ranking agent with these discriminatory viewpoints and upon information and belief without sufficient training.

27.    Jamshed then stated that he needed supervisorial approval from Lufthansa's corporate headquarters before allowing Roe and Doe to check in and board their flight, which Plaintiffs are informed and believe, was not true.  Jamshed returned to the check-in counter.  He spoke in Urdu with another of Lufthansa's employees and agents.  Based on the immediately prior exchange with Jamshed, as well as the other agent's body language and reaction (*e.g.*, looking at Plaintiffs with wide, unapproving eyes), it was clear to Doe and Roe that Jamshed and the agent were talking about them, their sexual orientation, and their marriage.

28.    Doe and Roe returned to the check-in area.  After Jamshed and the agent finished talking, Jamshed approached Plaintiffs.  (At this point, 45 minutes had elapsed.)  In English, Jamshed, yet again in front of other customers, employees, and passersby, loudly exclaimed, "So you two men are married?"  Many of Lufthansa's employees and numerous passengers in the area were within earshot of Jamshed's unlawful disclosure of Plaintiffs' personal and highly sensitive information regarding their sexual orientation and marital status.

29.     Jamshed and other Lufthansa employees and agents began speaking in English about Doe, Roe, and their relationship.  Jamshed told Doe and Roe that he needed copies of their passports, Roe's visa, and their marriage certificate so that he could email the documents to Lufthansa's headquarters in Germany.  Jamshed then took Doe to Lufthansa's primary office in the airport terminal to collect and forward by email copies of Doe's and Roe's passports and marriage certificate.

30.     Doe repeatedly explained to Jamshed how sensitive and confidential their sexual orientation and marital status were to him and Roe.  Doe even confessed to Jamshed that he worried the Saudi Arabian government might intercept electronic communications sent between Lufthansa's office in Saudi Arabia and its corporate headquarters in Germany.  Doe's complaints and worries were ignored by Lufthansa and its employees and agents, and indeed Jamshed responded by asking if Doe was threatening him.  Jamshed's accusation shocked Doe since in fact, it was Jamshed's loud disclosure which obviously had placed Roe and Doe at great risk.

31.     Doe was held in Lufthansa's office while he waited for approval from Lufthansa headquarters.  Worried about the confidential status of the documents, the disclosure of their sexual orientation and marital status that had already occurred, and that they might miss their flight, Doe asked Jamshed multiple times to call Lufthansa's Riyadh station chief, a German national, who was out of the office on what Doe was told was a shopping trip.  Jamshed eventually did reach Lufthansa's Riyadh station chief, who he referred to as "Pietre" or "Peter," and who refused to speak with Doe.

32.     An hour passed, and Doe was still waiting in Lufthansa's office.  Finally, immediately prior to the departure of Doe and Roe's flight, they were allowed to board the flight.

**D.      Doe and Roe Immediately Took Steps to Mitigate the Damage from Lufthansa's Public Disclosures**

33.     Plaintiffs immediately started efforts to mitigate the predictable damage of Lufthansa and Jamshed's past and any future public disclosures, as well as to remedy the probable danger posed by any unsecure electronic retention and transmission of documents related to their marital status and sexual orientation.

34.     Once on the first leg of their flight to Frankfurt, Doe spoke with Lufthansa's purser on board and explained what had happened at Riyadh airport.  Both the purser and captain on board the flight told Doe that the captain contacted Lufthansa's global security team via telex, and that Lufthansa' station chief in Riyadh had been told by the global security team that Doe and Roe's information was confidential and that it would be deleted from Lufthansa's computers immediately. A true and correct copy of this telex (transmitted in German) and an English translation is attached to this Complaint as **Exhibit C.**

35.     Doe also asked the captain and purser to ensure that a Lufthansa employee met him and Roe upon arriving in Frankfurt so they could make a proper complaint about Lufthansa's conduct in Riyadh.  Upon landing, Doe and Roe were not met by any Lufthansa agent and were unable to register a formal complaint at that time.

36.     On their second flight, from Frankfurt to San Francisco, Doe continued to pursue immediate mitigation efforts.  Doe again spoke with Lufthansa's purser on board, Claudia Tillman, about Lufthansa's and Jamshed's conduct during check-in in Riyadh.  Tillman spoke with the captain and then informed Plaintiffs that the captain sent a telex to Lufthansa's global security team in Germany.  A true and correct copy of this second telex (transmitted in German) and English translation is attached to this Complaint as **Exhibit D**.  Plaintiffs were later told during their flight that their electronically transmitted information—passports, visas, marriage certificate, and any evidence suggesting Plaintiffs' relationship, marital status, and/or sexual orientation—had been destroyed.  The captain also sent a telex to Lufthansa's agents and employees in San Francisco, California, asking for someone to meet Doe and Roe at the airport so they could lodge a complaint.

37.     Doe and Roe were met by one of Lufthansa's agents when they landed in San Francisco.  This Lufthansa agent assured them that one of Lufthansa's agents based in New York would call them within the hour.  Plaintiffs never received that call.

**E.     <u>Lufthansa's Discrimination Against Roe and Doe Because of their Sexual Orientation and Failure to Adequately Train Employees was Grossly Negligent</u>**

38.     Roe and Doe were subjected to additional scrutiny, detention, and the unlawful and unauthorized disclosure of their personal information due to their sexual orientation.

Lufthansa's inquiry into Roe and Doe's marital status should have ended upon presentation of their marriage certificate and under no circumstances should Lufthansa have publicly disclosed this information.

39.    Lufthansa is subject to the GDPR's requirements on the collection and processing of customer information worldwide.  Lufthansa is thus responsible for ensuring that all its personnel worldwide are trained on their legal obligations to collect and process customers' personal data, and, in particular, how to process the special categories of personal data described by the GDPR, such as sexual orientation.  Lufthansa's privacy policy and "data protection and information" webpage recognizes that such a duty extends to Lufthansa's worldwide activities and also specifically applies during the check-in process.

40.    Training Lufthansa's employees to comply with Art. 9 of the GDPR, which governs categories of particularly sensitive personal information such as sexual orientation, is especially important in Saudi Arabia—a country known to have vastly different norms regarding homosexuality, and in which the government severely punishes persons based on their sexual orientation and is known to intercept email and to place government informants as employees in private foreign corporations.  A recent example of such conduct includes the infamous and recently-convicted Saudi Arabian spy who was working undercover at Twitter from 2013 until 2015 to gain unauthorized access to Twitter accounts in order to feed information about dissidents to the Saudi Arabian government.[2]  The spy was arrested in 2019 and convicted and sentenced in December 2022. The court recognized that the disclosed information could have had "serious consequences" for those affected account holders.  By operating in Saudi Arabia, Lufthansa was upon information and belief on notice of such norms, practices, and harmful consequences.  Moreover, Doe explicitly warned Jamshed that the Saudi Arabian government might intercept communications, which additionally specifically placed Jamshed and Lufthansa on notice of the government's norms and practices.

---

[2] Kalley Huang & Kate Conger, Former Twitter Employee Convicted of Charges Related to Spying for Saudis, N.Y. Times, https://www.nytimes.com/2022/08/09/technology/twitter-saudi-arabia-spying-ahmad-abouammo.html (last visited Dec. 19, 2022).

41.     Unfortunately, Roe and Doe's expressed concerns regarding the unlawful, public disclosure of their marital status and sexual orientation at the Riyadh airport and the integrity of electronic transmissions in Saudi Arabia were well founded.  Roe and Doe have confirmed that information regarding Doe's (and, on information and belief, Roe's as well) sexual orientation was transmitted to the Saudi Arabian government.


41.     Lufthansa acted with deliberate and reckless disregard for the safety of others by failing to adequately train its employees worldwide on how to collect, process, and transmit passengers' sensitive personal data—including and especially regarding passengers' sexual orientation.

**F.      Lufthansa's Public and Unlawful Disclosure of Their Sexual Orientation Has Severely Injured Roe and Doe and Can Be Reasonably Expected to Continue Doing So**

42.     Unfortunately, Roe and Doe's expressed concerns regarding the unlawful, public disclosure of their marital status and sexual orientation at the Riyadh airport and the integrity of electronic transmissions in Saudi Arabia were well founded.  Roe and Doe have confirmed that information regarding Doe's (and, on information and belief, Roe's as well) sexual orientation was transmitted to the Saudi Arabian government.

43.     The Saudi Arabian government maintains online profiles for all citizens and permanent residents which includes, among other information, identification of a person's marital status.  Prior to May 25, 2021, Doe's marital status had consistently been identified as "single."  Sometime between May 25, 2021 and late June 2021, Doe's marital status in records maintained by the Saudi Arabian government was changed from "single" to "married."  Plaintiffs had taken extreme care to hide their relationship from the Saudi Arabian government for 33 years.  Aside from Lufthansa's unlawful and reckless disregard for Roe and Doe's privacy, there is no conceivable way the Saudi Arabian government could have learned about Plaintiffs' marriage other than as a result of the incident described herein.

44.     Because of Lufthansa's unlawful and reckless conduct, which necessarily caused Doe's marital status to be disclosed to the Saudi Arabian government, Roe has not returned to Saudi Arabia since the May 25, 2021 flight for fear of the harsh penalties faced by Saudi citizens like himself simply for being gay—with the most lenient punishment being the revocation of his passport and inability to ever leave Saudi Arabia, and escalating to potential harassment of his family, imprisonment, or the risk of being executed because of his sexual orientation and relationship with Doe.  Roe was forced to quickly (and at great expense) obtain a visa that allowed him to legally remain in the United States instead of returning home to Saudi Arabia.  Recently, in January 2023,

Roe was finally granted a provisional green card for permanent residency in the United States—for which he applied in August 2021 and for which Roe and Doe incurred significant legal fees and other costs. It is uncertain if Roe's green card status will ensure his ability to stay in the United States, but is a positive first step to hopefully becoming a United States citizen so that he may remain indefinitely in the United States.

45. Even as a person married to a U.S. citizen, citizenship is never guaranteed. Roe and Doe live with the uncertainty of whether Roe will be permitted to remain in the United States or if he will be required to leave and live elsewhere, which has caused both Roe and Doe a great deal of anxiety and unrest. When necessary for travel, Roe is still reliant on his Saudi Arabian passport, which creates some traveling risk, especially if Saudi Arabia should revoke his passport.

46. On top of this, Roe has not seen his family—who all live in Saudi Arabia and do not know he is gay—for over one-and-a-half years. He has been forced to lie to his family about why he cannot return to Saudi Arabia. He fears that, should he tell his family about his sexual orientation and relationship with Doe, he risks their safety with possible retribution by the Saudi Arabian government.

47. Roe cannot imagine a time that it would be safe for him to return to Saudi Arabia. Doe has separately inquired of high-ranking officials at the United States consulate as to whether it might be safe for Roe to return to Saudi Arabia, and they have unanimously concurred that Roe's safety cannot be assured if he were to return home.

48. Because of Lufthansa's egregious breach of Roe and Doe's privacy, and of the sensitive personally identifiable information at issue, Roe has essentially lost his home and country; he can never return to his birthplace, his family, his culture, his language, or his sense of belonging, because these are all tethered to his home—Saudi Arabia.

49. Roe's personal economic monetary losses include, but are not limited to:

    a. loss of his Saudi Arabian retirement benefits (similar to American Social Security benefits);

    b. loss of free medical care offered to Saudi citizens;

    c. cost of American medical care;

d.  cost of applying for a spousal Green Card and eventually (hopefully) U.S. citizenship;

e.  losses associated with the sale of properties that Roe managed in Saudi Arabia that he was forced to quickly sell for a substantial loss of around $300,000 because he could not reasonably and responsibly manage them from California;

f.  future losses associated with lost rental income of the sold properties that Roe expected would provide him with substantial income for the foreseeable future; and

g.  increased costs associated with travel by himself and his family so that they may visit with each other in a neutral country.

50.   Moreover, Roe has and continues to suffer great emotional distress because of his inability to ever return to Saudi Arabia absent a dramatic change in policy by Saudi Arabia; over the possibility that his friends and family may be harassed or persecuted by the Saudi government; because his family could have their passports taken away to prevent him from ever meeting with them outside of Saudi Arabia; and because he and Doe, his spouse, will now be separated for significant amounts of time each year.

51.   While Roe cannot return to Saudi Arabia, Doe as a U.S. citizen has been and will be able to return for work in Saudi Arabia with less risk of severe government retribution.  Doe still fears that his sexual orientation and marital status will cost him his job, result in public shaming, and potential permanent deportation from Saudi Arabia.  Moreover, he will be separated from Roe for significant parts of the year, itself a cause of great emotional distress, and which will require substantial expenditures in additional airline tickets each year so that he can see his spouse at all. Doe hopes to fly to the United States about every six weeks (about nine times per year) to spend time with Roe, however this frequency of travel would be cost prohibitive.  At a minimum, Doe can travel at personal cost to the United States quarterly to San Francisco, and sometimes on business trips with additional personal expenditure to fly to San Francisco. Prior to Lufthansa's wrongful conduct, Doe typically visited the United States only three or four times per year.

## FIRST CAUSE OF ACTION
### (Public Disclosure of Private Facts)

52.     The allegations set forth in the preceding paragraphs are all re-alleged and incorporated by reference herein.

53.     As has been described herein, for 33 years, and further since they married, Plaintiffs have gone to great lengths to keep their relationship completely private, even from family and friends.  Before the events described herein, the fact of their marriage could be determined from public records in California, but only if a person suspected they were married and had good reason to actually search through California public records.  For all practical purposes, therefore, the facts of their relationship remained private and could have been expected to remain private, in particular so far as the government of Saudi Arabia is concerned.

54.     Plaintiffs' disclosed their marital status (and thus their sexual orientation) *only* for the limited and necessary purpose of demonstrating compliance with U.S. immigration requirements existing as a result of the pandemic.  Plaintiffs authorized use of the information for no other purpose and, in fact, forbade it; they had every reason to believe Lufthansa would comply because of its own policies which it touted to every actual and potential ticket buyer. Instead, Lufthansa made a public, unlawful announcement regarding Plaintiffs' relationship, marital status, and sexual orientation in front of dozens in a crowded airport.  On information and belief, Lufthansa or its agents transmitted nonencrypted (or encrypted messages that Lufthansa was on notice that the Saudi government could access) and nonredacted personal information related to, Plaintiffs.  Moreover, Plaintiffs are informed and believe, and thereon allege, based upon the Saudi Arabian government's notice to Doe of his change in status, that Lufthansa actually gave Plaintiffs' private facts to the Saudi Arabian government notwithstanding Lufthansa's knowledge of the likely consequences.

55.     Lufthansa had a duty not to disclose Plaintiffs' private facts.  Moreover, Lufthansa had an obligation to mitigate the damages the disclosure would cause and would continue to cause.  But plaintiffs are informed and believe, and thereon allege, that Lufthansa did not do so, notwithstanding statements made to Plaintiffs to the contrary, and that Lufthansa therefore engaged in either fraudulent or negligent misrepresentation.

56.     As a direct and proximate result of Lufthansa's actions, Plaintiffs have sustained numerous economic and non-economic injuries, including but not limited to: effective loss of citizenship, loss of companionship, loss of consortium, loss of familial relationships, costs associated with traveling to visit one another, costs associated with a forced sale of Saudi Arabian properties, costs associated to procure a visa for Roe to remain in the United States, substantial emotional distress, and other costs and damages, in a sum according to proof at trial and within the jurisdictional limits of this court.

57.     Because Lufthansa through its authorized and inadequately trained agents acted with fraud, oppression and malice, as described above, Plaintiffs are also entitled to exemplary or punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

58.     The allegations set forth in the preceding paragraphs are all re-alleged and incorporated by reference herein.

59.     Lufthansa's unauthorized disclosure of Plaintiffs' sensitive personal information and failure to secure the same constituted intentional, severe and outrageous misconduct and caused Plaintiffs extreme and severe emotional distress.  At all relevant times Lufthansa knew its conduct was outrageous and that it would cause severe emotional distress to Plaintiffs.

60.     Lufthansa and its agents intended to cause Plaintiffs' emotional distress and/or Lufthansa acted with reckless disregard of the probability that Plaintiffs would suffer severe emotional distress due to Lufthansa's conduct.

61.     In light of the severe punishment and stigma attached to homosexuality in Saudi Arabia, Lufthansa was on notice that particular attention needed to be given to training its employees and agents in Saudi Arabia regarding Lufthansa's so-called antidiscrimination policy based on sexual orientation and to maintain the privacy of customers' disclosed sexual orientation such that any such information is collected and disclosed only when necessary.

///

///

62.     Lufthansa was aware that disclosing Plaintiffs' personal information and failure to secure the same in Saudi Arabia would cause Plaintiffs severe hardship and, in particular, would put Roe at significant risk of harm by the Saudi government.

63.     Lufthansa's extreme and outrageous conduct was a substantial factor in causing, and did directly and proximately cause, Plaintiffs' severe emotional distress.  Plaintiffs have sustained and continue to sustain substantial losses of earnings, astronomical travel expenses, and mental and physical distress, all to their damage in an amount to be proven at trial, and within the jurisdictional limits of this court.

64.     Lufthansa's misconduct was committed intentionally, in a malicious, oppressive, despicable, and fraudulent manner, entitling Plaintiffs to exemplary and punitive damages, an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

65.     The allegations set forth in the preceding paragraphs are all re-alleged and incorporated by reference herein.

66.     Lufthansa notifies website browsers of its data protection and information policy through a pop-up when they first access Lufthansa's website.  A customer that purchases their airline tickets online is further required to click to "accept all terms and conditions," which again includes a link to Lufthansa's privacy policy and "data protection and information" page.  These terms and conditions are binding and enforceable as part of Doe and Roe's contract with Lufthansa to provide commercial air services from Riyadh to San Francisco.

67.     Lufthansa is a data processor subject to the privacy and data protection regulations in the European Union's GDPR.

68.     Lufthansa's data protection and information policy states that it will comply with the GDPR and German's similar data protection regime, the BDSG.  In its terms and conditions which Lufthansa expressly incorporated in its contracts with the Plaintiffs, Lufthansa promised that it would only process data necessary for the performance of its contract with a customer, including in the "managing check-in processes from check-in invitation, through the entry documents check[.]"

Under Article 9 of the GDPR, information regarding a person's sexual orientation is considered particularly sensitive and additional precautions should have been taken to limit collection and avoid disclosure of this information.

69.    Lufthansa's privacy policy also promises any transmitted information shall be done securely, which necessarily implies that Lufthansa shall not intentionally or unintentionally cause a breach of such information.

70.    Roe and Doe provided their consent for Lufthansa to collect and disclose information regarding their sexual orientation/marital status only for the limited purpose of permitting Lufthansa to check their COVID-19 entry documents and so that Lufthansa could provide required information to US immigration officials.  This consent did not extend to the check-in agent's loud proclamation in a crowded check-in area that Roe and Doe were married (and thus gay) during the check-in process or to any other transmission of their personal information.  Plaintiffs similarly did not consent to the unauthorized disclosure of their marital status to the Saudi Arabian government.

71.    Lufthansa and its agents conduct in disclosing Roe and Doe's sexual orientation publicly in the Riyadh airport and sending potential unsecure or unauthorized electronic transmissions to the same effect is a breach of Lufthansa's contract with Roe and Doe.

72.    As a result of Lufthansa's breach of contract, Plaintiffs have suffered monetary damages in an amount to be proven at trial, and within the jurisdictional limits of this court.

**FOURTH CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**

73.    The allegations set forth in the preceding paragraphs are all re-alleged and incorporated by reference herein.

74.    Given all the facts and circumstances as alleged herein, Lufthansa, its agents and its employees knew or should have known that the conduct described herein was highly likely to cause severe emotional distress to the Plaintiffs, as it in fact has done.  Lufthansa had a duty to protect Plaintiffs and persons in Plaintiffs' position – and indeed, all Lufthansa customers – from the emotional distress which almost certainly would occur in the event Lufthansa, and its agents and employees, violated the privacy standards applicable to them and expressly acknowledged in the

terms and conditions applicable to all Lufthansa ticket contracts. Lufthansa breached that duty by not sufficiently monitoring, supervising, training and educating its employees concerning the sensitivity of private and confidential information and the probable impact on those victimized by failure to adhere to those standards; and Lufthansa further breached its duty through the behavior of its employees and agents as described fully herein.

75.     Lufthansa's multiple breaches of duty, as alleged herein, foreseeably and proximately caused severe emotional distress to Plaintiffs, and thereby damaged them in an amount to be proven at trial, and within the jurisdictional limitations of this court.

**FIFTH CAUSE OF ACTION**
**(Loss of Consortium [Civ. Code § 1431.2])**

76.     The allegations set forth in the preceding paragraphs are all re-alleged and incorporated by reference herein.

77.     Plaintiffs have suffered loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, and/or enjoyment of sexual relations.

78.     Lufthansa's conduct has caused and will continue to cause Plaintiffs, a married couple, to live across the world from one another with no reunification date in sight.

79.     Plaintiffs will continue to suffer loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, and/or enjoyment of sexual relations until they can, if ever, be permanently reunited.

80.     Defendants' misconduct has thereby caused Plaintiffs to suffer damages in an amount to be proven at trial, and within the jurisdictional limits of this Court.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief as follows:

1.     For general and special damages according to proof;

2.     For punitive and exemplary damages, according to proof;

3.     For pre-judgment and post-judgment interest on all damages awarded, if and to the extent allowed by law;

4.     For reasonable attorneys' fees, if and to the extent allowed by the law;

1    5.    For costs of suit incurred;

2    6.    for such other and further relief as the Court may deem just and proper.

3

4   DATED: July 14, 2023                 PUTTERMAN | YU | WANG LLP

5

6                                         By: _____

7                                              DONALD J. PUTTERMAN
                                               Attorneys for Plaintiffs
8                                              JOHN DOE and ROBERT DOE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                         CASE NO.

EXHIBIT A

**STATEMENT AND DESIGNATION**
**BY FOREIGN CORPORATION**

3212545

**FILED**
In the Office of the Secretary of State
of the State of California

**MAY 1 5** 2009

Deutsche Lufthansa Aktiengesellschaft
_____
(Name of Corporation)

_____, a corporation organized and existing under the

laws of _____ Germany _____, makes the following statements and designation:
(State or Place of Incorporation)

1. The address of its principal executive office is   1640 Hempstead Turnpike, East Meadow NY 11554

_____

2. The address of its principal office in the State of California is _____
(If none, leave Item 2 blank.)

_____

## DESIGNATION OF AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA
(Complete either Item 3 or Item 4 )

3. (Use this paragraph if the process **agent is a natural person** )

_____ , a natural person residing in the State of

California, whose complete street address is _____

_____ , is designated as agent upon whom process directed to
this corporation may be served within the State of California, in the manner provided by law.

4. (Use this paragraph if the process **agent is another corporation**.)

CT Corporation System
_____

a corporation organized and existing under the laws of _____ Delaware _____ ,
is designated as agent upon whom process directed to this corporation may be served within the State
of California, in the manner provided by law.

5. It irrevocably consents to service of process directed to it upon the agent designated above, and to
service of process on the Secretary of State of the State of California if the agent so designated or the
agent's successor is no longer authorized to act or cannot be found at the address given.

_____         Jens Bischof, Vice President
(Signature of Corporate Officer)              (Typed Name and Title of Officer Signing)

_If an individual is designated as the agent for service of process, include the agent's business or residential **street** address in California (a P O. Box
address is not acceptable). If another corporation is designated as the agent for service of process, do not include the address of the designated
corporation. **Note: Corporate agents must have complied with California Corporations Code section 1505 prior to designation, and a
corporation cannot act as its own agent.**_

Secretary of State **Form**
S&DC-STOCK/NONPROFIT (REV 01/2008)

CERTIFIED PRINTOUT
OF THE COMMERCIAL REGISTER
WITH TRANSLATION
IN ENGLISH LANGUAGE



CIVIL LAW NOTARY

# RONALD GERNS

Friedrichstraße 63
60323 Frankfurt am Main,
State of Hessen, Germany

I hereby certify that this instrument in german
language is a true and a complete printout of the
electronic commercial register of today. The
attached translation in english language is a true
and complete translation of this printout.

Frankfurt am Main, 27 February 2009



Ronald Gerns
Civil Law Notary

| Handelsregister B des Amtsgerichts Köln | Abteilung B Wiedergabe des aktuellen Registerinhalts Abruf vom 27.02.2009 11:52 | Nummer der Firma: **HRB 2168** |
|---|---|---|
| **-Ausdruck-** | Seite   1   von   3 | |

1.  **Anzahl der bisherigen Eintragungen:**

    36

2.  **a) Firma:**

    Deutsche Lufthansa Aktiengesellschaft

    **b) Sitz, Niederlassung, inländische Geschäftsanschrift, empfangsberechtigte Person, Zweigniederlassungen:**

    Köln

    **c) Gegenstand des Unternehmens:**

    Luftverkehr im In- und Ausland und der Betrieb aller mit der Luftfahrt und ihrer Förderung zusammenhängender Geschäfte und Einrichtungen;

3.  **Grund- oder Stammkapital:**

    1.172.320.184,32 EUR

4.  **a) Allgemeine Vertretungsregelung:**

    Der Vorstand besteht aus mindestens zwei Personen. Die Vertretung erfolgt durch zwei Vorstandsmitglieder oder durch ein Vorstandsmitglied mit einem Prokuristen.

    **b) Vorstand, Leitungsorgan, geschäftsführende Direktoren, persönlich haftender Gesellschafter, Geschäftsführer, Vertretungsberechtigte und besondere Vertretungsbefugnis:**

    Vorstand: Gemkow, Stephan, Overath, *23.01.1960
    Vorstand: Lauer, Stefan, Idstein, *24.03.1955
    Vorstandsvorsitzender: Mayrhuber, Wolfgang, Hamburg, *22.03.1947

5.  **Prokura:**

    Gesamtprokura gemeinsam mit einem Vorstandsmitglied oder einem anderen Prokuristen mit der Ermächtigung zur Veräußerung und Belastung von Grundstücken:
    Antinori, Thierry, Paris/Frankreich, *26.07.1961
    Buchholz, Nico, Berlin, *25.03.1961
    Buse, Joachim, Buchholz, *07.05.1957
    Donath, Ulrike, Köln
    Fredrich, Helmut, Bönnigstedt
    Furck, Klaus, Köln
    Garnadt, Karl Ulrich, Niedernhausen, *19.01.1957
    Gerber, Peter, Butzbach, *01.03.1964
    Dr. Hätty, Holger, Walluf, *27.07.1958
    Dr. Klingenberg, Christioph, Niedernhausen, *22.01.1961
    Raps, Jürgen, Bad Homburg, *11.08.1951
    Reininger, Ursel, Frankfurt, *04.12.1953
    Dr. Schmitt, Martin, Wiesbaden, *09.08.1960
    Schwierholz, Arnd, Frankfurt, *28.01.1970
    Steinke, Karl-Heinz, Idstein, *12.01.1953
    Steuernagel, Martin, Frankfurt, *08.02.1969
    Tillmann, Axel, Bergheim, *19.02.1964
    von Ruckteschell, Nicolai Ingo, Swisttal

| Handelsregister B des Amtsgerichts Köln | Abteilung B Wiedergabe des aktuellen Registerinhalts Abruf vom 27.02.2009 11:52 | Nummer der Firma: **HRB 2168** |
|---|---|---|
| **-Ausdruck-** | Seite 2 von 3 | |

6. **a) Rechtsform, Beginn, Satzung oder Gesellschaftsvertrag:**

Aktiengesellschaft

Satzung vom 06.01.1953

Zuletzt geändert durch Beschluss vom 29 04.2008

**b) Sonstige Rechtsverhältnisse:**

Das Grundkapital ist durch Beschluss der Hauptversammlung vom 16.06.1999 um bis zu EUR 97.689.600,00 durch Ausgabe von bis zu 38.160.000 neuen, auf den Namen lautenden Stückaktien zur Durchführung von bis zum 15.06.2004 begebenen Wandel- und/oder Optionsschuldverschreibungen bedingt erhöht (Bedingtes Kapital I).

Der Vorstand ist durch Beschluss der Hauptversammlung vom 16.06.2004 ermächtigt, bis zum 15.06.2009 mit Zustimmung des Aufsichtsrats das Gundkapital um bis zu EUR 25.000.000,00 durch ein- oder mehrmalige Ausgabe von neuen, auf den Namen lautenden Stückaktien gegen Bareinlage zu erhöhen (Genehmigtes Kapital B).

Das bisherige genehmigte Kapital (Genehmigtes Kapital A) von bis zu 200.000.000,- Euro ist aufgehoben.
Der Vorstand ist ermächtigt, bis zum 24.05.2010 mit Zustimmung des Aufsichtsrats das Grundkapital der Gesellschaft um bis zu Euro  200.000.000 durch ein-oder mehrmalige Ausgabe von neuen, auf den Namen lautenden Stückaktien gegen Bar-oder Sacheinlage zu erhöhen ( Genehmigtes Kapital A).

Der Vorstand wird ermächtigt, im Falle des Eintritts der Voraussetzungen des § 4 Abs. 3 LuftNaSiG mit Zustimmung des Aufsichtsrats das Grundkapital der Gesellschaft durch Ausgabe neuer Aktien gegen Bareinlage zu erhöhen und hierbei das Bezugsrecht der Aktionäre auszuschließen.
Der Ausgabebetrag der neuen Aktien ist im Einvernehmen mit dem Ausichtsrat festzulegen und darf den Börsenkurs nicht wesentlich unterschreiten.
Eine Kapitalerhöhung nach dieser Vorschrift darf den Umfang von 10 Prozent des Grundkapitals der Gesellschaft im Zeitpunkt der Maßnahme nicht übersteigen.

Der Vorstand wird ermächtigt unter den Voraussetzungen des § 5 Abs. 2 LuftNaSiG mit Zustimmung des Aufsichtsrats Aktionäre in dem Umfang, wie es zur Erfüllung der Anforderungen für die Aufrechterhaltung der luftverkehrsrechtlichen Befugnisse erforderlich ist, und in der Reihenfolge des § 5 Abs. 3  LuftNaSiG unter Setzung einer angemessenen Frist mit Hinweis auf die andernfalls mögliche Rechtsfolge, der Aktien nach Maßgabe des § 5 Abs. 7 LuftNaSiG verlustig zu gehen, aufzufordern, sämtliche einen Teil der von ihnen gehaltenen Aktien zu veräußern und die Veräußerung der Gesellschaft unverzüglich nachzuweisen.
Die Aufforderung mit dem Hinweis auf die mögliche Rechtsfolge, der Aktien verlustigt zu gehen, hat hierfür eine Frist von mindestens vier Wochen vorzusehen.
An Stelle der öffentlichen  Bekanntmachung genügt die einmalige Einzelaufforderung an die betreffenden Aktionäre; dabei muß eine Nachfrist gewährt werden, die mindestens zwei Wochen seit dem Empfang der Einzelaufforderung beträgt.

Das Grundkapital ist um bis zu Euro 117.227.520 durch Ausgabe von bis zu 45.792.000 neuen, auf den Namen lautende Stückaktien bedingt erhöht (Bedingtes Kapital II). Die bedingte Kapitalerhöhung wird nur insoweit durchgeführt, wie die Inhaber bzw. Gläubiger von Wandlungsrechten oder Optionsscheinen, die von der Deutschen Lufthansa AG oder einer unmittelbaren oder mittelbaren Mehrheitsbeteiligungsgesellschaft aufgrund des Ermächtigungsbeschlusses der Hauptversammlung vom 17. Mai 2006 bis zum 16. Mai 2011 gegen bar ausgegebenen Wandel- und/oder Optionsschuldverschreibungen, Gewinnschuldverschreibungen und/oder Genussrechten (bzw. Kombinationen dieser Instrumente) beigefügt sind, von ihren Wandlungs- bzw. Optionsrechten Gebrauch machen oder die zur Wandlung verpflichteten Inhaber bzw. Gläubiger der von der Deutschen Lufthansa AG oder durch eine unmittelbare oder mittelbare Mehrheitsbeteiligungsgesellschaft der Deutschen Lufthansa AG aufgrund des Ermächtigungsbeschlusses der

| Handelsregister B des Amtsgerichts Köln | Abteilung B Wiedergabe des aktuellen Registerinhalts Abruf vom 27.02.2009 11:52 | Nummer der Firma: **HRB 2168** |
|---|---|---|
| **-Ausdruck-** | Seite  3   von  3 | |

Hauptversammlung vom 17. Mai 2006 bis zum 16. Mai 2011 ausgegebenen Wandelschuldverschreibungen (bzw. Genussrechte oder Gewinnschuldverschreibungen mit Wandlungspflicht) ihre Pflicht zur Wandlung erfüllen, und soweit nicht eigene Aktien zur Bedienung eingesetzt werden.

Das in der Hauptversammlung vom 16.06.1999 beschlossenen bedingte Kapital (Bedingtes Kapital I) beträgt nach Ausgabe von Bezugsaktien im Geschäftsjahr 2007 noch 97.644.615,68 EUR.

7.    **a) Tag der letzten Eintragung:**

16.05.2008

| Commercial Register B of Cologne Local Court | Division B<br>Copy of the current register entry<br>Retrieved on 27.02.2009 11:52 | Company number:<br>**HRB 2168** |
|---|---|---|
| **- Printout -** | Page 1 of 3 | |

1. **Number of entries to date:**

   36

2. **a) Name of the company:**

   Deutsche Lufthansa Aktiengesellschaft

   **b) Seat of the Company, establishment, domestic business address, person authorized to take delivery, branch establishments:**

   Cologne

   **c) Object of the company:**

   National and international air traffic and the conduct of all business and the operation of all facilities relating to and conducive to civil aviation.

3. **Registered or share capital, capital stock**

   1,172,320,184.32 EUR

4. **a) General rules of representation:**

   The executive board consists of at least two persons. The company is represented by two executive board members or by one executive board member acting jointly with the holder of a power of procuration (Prokurist).

   **b) Executive board members, managing body, general managers, personally liable partner, managing directors, authorized representatives and special power of representation:**

   Executive board member: Gemkow, Stephan, Overath, *23 January 1960
   Executive board member: Lauer, Stefan, Idstein, *24 March 1955
   Executive board chairman: Mayrhuber, Wolfgang, Hamburg, *22 March 1947

5. **Power of procuration**

   Joint collective power of procuration acting together with one executive board member or with another holder of a power of procuration having an authorization to sell and encumber land.
   Antinori, Thierry, Paris/France, 26 July 1961
   Buchholz, Nico, Berlin, *25 March 1961
   Buse, Joachim, Buchholz, *7 May 1957
   Donath, Ulrike, Cologne
   Fredrich, Helmut, Bönnigstedt
   Furck, Klaus, Cologne
   Garnadt, Karl Ulrich, Niedernhausen, *19 January 1957
   Gerber, Peter, Butzbach, *1 March 1964
   Dr. Hätty, Holger, Walluf, *27 July 1958
   Dr. Klingenberg, Christioph, Niedernhausen, *22 January 1961
   Raps, Jürgen, Bad Homburg, *11 August 1951
   Reininger, Ursel, Frankfurt, *4 December 1953
   Dr. Schmitt, Martin, Wiesbaden, *9 August 1960
   Schwierholz, Arnd, Frankfurt, *28 January 1970
   Steinke, Karl-Heinz, Idstein, *12 January 1953
   Steuernagel, Martin, Frankfurt, *8 February 1969
   Tillmann, Axel, Bergheim *19 February 1964
   von Ruckteschell, Nicolai Ingo, Swisttal

| Commercial Register B of Cologne Local Court | Division B<br>Copy of the current register entry<br>Retrieved on 27.02.2009 11:52 | Company number:<br>**HRB 2168** |
|---|---|---|
| **- Printout -** | Page 2 of 3 | |

6.   **a) Legal form, commencement, bylaws or partnership agreement:**

Public limited company/open corporation/Aktiengesellschaft.

Articles of association adopted on 6 January 1953

Last revised by resolution adopted on 29.04.2008

**b) Other legal relationships**

By resolution of the AGM adopted on 16 June 1999 the company's share capital has been conditionally increased by up to Euro 97,689,600.00 by issuing up to 38,160,000 new no-par value registered shares to implement convertible bonds and/ or bonds with warrants attached issued until 15 June 2004 (conditional capital I).

By resolution of the AGM adopted on 16 June 2004 the executive board is authorised, subject to the consent of the supervisory board, to increase the company's share capital until 15 June 2009 by up to Euro 25,000,000.00 by a one-off issue, or by an issue in steps, of new registered no-par value shares against a cash contribution (authorised capital B).

The authorised capital (authorised capital A) hitherto of up to Euro 200,000,000 is cancelled. The executive board is authorised, subject to the consent of the supervisory board, to increase the company's share capital until 24 May 2010 by up to Euro 200,000,000 by a one-off issue, or by an issue in steps, of new registered non-par value shares against a cash or non-cash contribution (authorised capital A).

In the event that the circumstances described in section 4 (3) of the Aviation Compliance Documenting Act (Luftverkehrsnachweissicherungsgesetz = LuftNaSiG) occur, the executive board shall be authorised, after obtaining the consent of the supervisory board, to increase the Company's share capital by issuing new shares against a contribution in cash and to rule that existing shareholders have no automatic right to subscribe to the new shares.
The issue price for the new shares shall be fixed in agreement with the supervisory board hut must not fall short of the current stock market price by a material margin.
A capital increase pursuant to this provision must not exceed 10 per cent of the Company's total share capital at the time the measure is taken.

In the event that the circumstances described in section 5 (2) LuftNaSiG occur, the executive board shall be authorised, after obtaining the consent of the Supervisory board, to demand shareholders to sell all or part of the shares held by them and to furnish evidence to the Company forthwith that they have done so. Shareholders will be called upon to take such action to the extent necessary to ensure that the Company meets the requirements for retaining its licences, rights and prerogatives under aviation laws and agreements and in the order stipulated in section 5 (3) LuftNaSiG. They shall be given an appropriate period of time to comply with this demand and shall be concurrently warned that their failure to comply may incur the legal consequence set out in section 5 (7) LuftNaSiG, under which their entitlement to own the shares can be rescinded.
The demand to the shareholders, together with the warning that they may forfeit their ownership of the shares as a possible legal consequence of their failure to comply, must allow a compliance period of at least four weeks.
A once-only individual call addressed to the shareholders in question may be made instead of a public announcement; in this case, a compliance period of at least two weeks from the date of receipt of the individual call must be granted.

The share capital is conditionally increased by up to Euro 117,227,520 by the issue of up to 45,792,000 new no-par value registered shares (conditional capital II). The conditional capital increase is to be implemented only to the extent that the owners or creditors of conversion rights or warrants attached to convertible bonds and/or bonds with warrants, participating bonds and/or profit-sharing rights (or combinations of these instruments) issued for cash until 16 May 2011 by Deutsche Lufthansa AG or a direct or indirect majority affiliate by reason of the

| Commercial Register B of Cologne Local Court | Division B<br>Copy of the current<br>register entry<br>Retrieved on 27.02.2009 11:52 | Company number:<br>**HRB 2168** |
|---|---|---|
| **- Printout -** | Page 3 of 3 | |

authorisation resolution adopted by the AGM on 17 May 2006, make use of their conversion or option rights, or to the extent that the owners or creditors with an obligation to convert as regards the convertible bonds (and/or profit-sharing rights or participating bonds with conversion obligation) issued by Deutsche Lufthansa AG until 16 May 2011 by reason of the authorisation resolution of the AGM on 17 May 2006 meet their duty to convert, and unless the Company's own shares are employed for bond servicing.

In the financial year 2007 the conditional capital as adopted in the AGM of 16 June 1999 (conditional capital I) was Euro 97,644,615.68 after issue of new shares.

7.    **a) Date of last entry:**

16.05.2008

EXHIBIT B



**Secretary of State**
**Application to Register a Foreign Limited Liability Company (LLC)**

| LLC-5 |

**2 0 1 9 1 1 5 1 0 4 2 1**



**FILED**
Secretary of State
State of California

**APR 1 8 2019**



**IMPORTANT — Read Instructions before completing this form.**

Must be submitted with a current Certificate of Good Standing issued by the government agency where the LLC was formed. See Instructions.

**Filing Fee** — **$70.00**

**Copy Fees** — First page $1.00; each attachment page $0.50; Certification Fee - $5.00

*Note:* Registered LLCs in California may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

**This Space For Office Use Only**

---

**1a. LLC Name** (Enter the exact name of the LLC as listed on your attached Certificate of Good Standing.)

LUFTHANSA GROUP BUSINESS SERVICES NEW YORK LLC

**1b. California Alternate Name, If Required** (See Instructions – Only enter an alternate name if the LLC name in 1a not available in California.)

---

**2. LLC History** (See Instructions – Ensure that the formation date and jurisdiction match the attached Certificate of Good Standing.)

| a. Date LLC was formed in home jurisdiction (MM/DD/YYYY) | b. Jurisdiction (State, foreign country or place where this LLC is formed.) |
|---|---|
| 2 / 21 / 2019 | Delaware |

**c. Authority Statement** (Do not alter Authority Statement)

This LLC currently has powers and privileges to conduct business in the state, foreign country or place entered in Item 2b.

---

**3. Business Addresses** (Enter the **complete** business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| a. Street Address of Principal Executive Office - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1640 Hempstead Turnpike | East Meadow | NY | 11554 |

| b. Street Address of Principal Office in California, **If any - Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

| c. Mailing Address of Principal Executive Office, **If different than Item 3a** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

---

**4. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 4a and 4b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

**CORPORATION** – Complete Item 4c only. Only include the name of the registered agent Corporation.

**c. California Registered Corporate Agent's Name** (if agent is a corporation) – Do not complete Item 4a or 4b

C T Corporation System

---

**5. Read and Sign Below** (See Instructions. Title not required.)

I am authorized to sign on behalf of the foreign LLC.

Signature

Frank Weinreich
Type or Print Name

LLC-5 (REV 01/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "LUFTHANSA GROUP BUSINESS SERVICES NEW
YORK LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE
AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE EIGHTH DAY OF APRIL, A.D.
2019.

Jeffrey W. Bullock, Secretary of State

7249303  8300

SR# 20192633740

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202601007

Date: 04-08-19

**2019115 10421**

EXHIBIT C

Exhibit C

.D-AIKN ---- DLH637        25MAY21 0241Z
Free Text FRASELH
GUTEN MORGEN LH 637,
QA DIE OPS DER STATION IN DIESEN ZEITEN MIT ABSOLUT MINIMUM STAFF
AUSKOMMEN MUSS, KOENNEN WIR LEIDER NIEMANDEN ABSTELLEN, DER DIE
BEIDEN HERREN 1 ZU 1 BZW 1 ZU 2 BETREUT. ICH SCHLAGE VOR, DASS DIE
GAESTE SICH NACH ARRIVAL ENTWEDER IN DER LOUNGE ODER AM SERVICE
CENTER MELDEN, WO DANN DER KONTAKT ZU EINEM SUPERVISOR PASSAGE
HERGESTELLT WERDEN KANN, UM DEN SACHVERHALT ZU BESPRECHEN.
DIE SCHICHTLEITUNG PASSAGE WERDE ICH ENTSPRECHEND BRIEFEN.
BESTE GRUESSE, TINA TURNHOEFER, HCC DUTY MANAGER

.D-AIKN ---- DLH637          MAY 25, 21 0241Z
Free Text FRASELH
GOOD MORNING LH 637,
OA WHEN THE OPS OF THE STATION HAS TO DEAL WITH THE ABSOLUTE MINIMUM
STAFF DURING THESE TIMES, WE CANNOT ASSIGN ANYONE TO LOOK AFTER THE TWO
GENTLEMEN 1 TO 1 OR 1 TO 2. I SUGGEST THAT GUESTS REPORT AFTER ARRIVAL TO
EITHER THE LOUNGE OR THE SERVICE CENTER WHERE THEN CONTACT TO A
SUPERVISOR PASSAGE CAN BE ESTABLISHED TO DISCUSS THE FACT. I WILL BRIEF THE
PASSAGE SHIFT MANAGEMENT ACCORDINGLY. BEST REGARDS, TINA TURNHOEFER,
HCC DUTY MANAGER

EXHIBIT D

title: Free Text FRACGLH 25-MAY 18:18

LH4547.5, HALLO COCKPIT, HALLO HR POLLMANN RUECKSPRACHE MIT R UH
GEFUEHRT AUFGEFUEHRLICHER SACHVERHALT ███████ IST US-BUERGER U ND
IST SAUDI MIT EINEM US-B1/B2 VISUM. DIESER TYP VON VISA IST WAEHREND
DER COVID PANDEMIE UNGUELTIG. IN DIESER NATIONALITAETSKONSTE LLATION I
ST

EINE EINREISE IN DIE USA NUR MOEGLICH, WENN NACHWEISLICH
SICHERGESTELLT WERDEN KANN, DASS HIER DER SAUDI MIT DEM US-B UERGER
VERHEIRATET IST. AUS DIESEM GRUNDE WURDE EINE KOPIE PER E-MA IL AN DIE
CBP FRA GESCHICKT. IN RUH SIND DIESE UNTERLAGEN/EMAIL/KOPIE ZERSTOERT
- SO GEM. LH RICHTLINIEN. AUCH KOENNEN DIE BEHOERDEN IN RUH DIE STATI
ON

NICHT AUFFORDERN LH DATEN (PERSONEN- UND/ODER UNTERNEHMENSBE ZOGEN)
HERAUSZUGEBEN. DIES ERFOLGT AUSSCHLIESSLICH UEBER UNS. ERGO: I N RUH
LIEGEN SEIT ABFLUG DER GAESTE KEINE KOPIE ETC. UEBER DIE HEI RATSURKUN
DE

VOR. IM CHECK IN SYSTEM IST NICHTS DAVON ERWAEHNT - EBENSO I N DER
BUCHUNG. GAESTE KOENNEN WIRKLICH GANZ BERUHIGT SEIN - DA IN SAU KEINE
BEHOERDE VON IHREN BEZIEHUNGSVERHAELTNIS WEISS.
FRAGEN BITTE JEDERZEIT GERNE. VG-SECDESK-FILIPE PEREIRA

Title: Free Text FRACGLH MAY 25 6:18 PM

LH454/25. HELLO COCKPIT, HELLO MR. POLLMANN, HAD A CONSULTATION WITH R UH. DETAILED FACTS. ███████ IS A US CITIZEN AND ██████ IS SAUDI ON A US B1/B2 VISA. THIS TYPE OF VISA IS INVALID DURING THE COVID PANDEMIC. WITH THIS NATIONALITY CONSTELLATION, ENTRY INTO THE USA IS ONLY POSSIBLE IF IT CAN BE PROVED THAT THE SAUDI IS MARRIED TO THE US CITIZENS HERE. FOR THIS REASON, A COPY OF THE EMAIL WAS SENT TO THE [ILLEGIBLE] FRA. THESE DOCUMENTS/EMAIL/COPY ARE DESTROYED IN RUH - IN ACCORDANCE WITH LH GUIDELINES. ALSO, THE AUTHORITIES IN RUH CANNOT ASK THE STATION TO RELEASE LH DATA (PERSONAL AND/OR COMPANY-RELATED. THIS IS DONE EXCLUSIVELY BY US. ERGO: IN RUH, NO COPIES ETC. REGARDING THE MARRIAGE CERTIFICATE ARE AVAILABLE SINCE THE DEPARTURE OF THE GUESTS. THERE IS NOTHING MENTIONED OF THIS IN THE CHECK IN SYSTEM – NOR IN THE BOOKING. GUESTS CAN REALLY FEEL AT EASE -BECAUSE NO AUTHORITY IN SAU KNOWS ABOUT YOUR RELATIONSHIP. IF THERE ARE ANY QUESTIONS PLEASE REACH OUT ANYTIME. KIND REGARDS—SECDESK - FILIPE PEREIRA