UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE and ROBERT ROE,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DEUTSCHE LUFTHANSA AKTIENGESELLSCHAFT, *et al.*,<br><br>　　　　　Defendants. | Case No. 23-cv-04413-SI<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURSIDICTION AND UNSEALING DOCKET NOS. 16-1 AND 17-1**<br><br>Re: Dkt. Nos. 16, 17 |

On March 22, 2024, the Court held a hearing on defendants' motions to dismiss for lack of personal jurisdiction, or in the alternative, for judgment on the pleadings. For the reasons set forth below, the Court GRANTS defendants' motions to dismiss based on lack of personal jurisdiction. The Court also directs the Clerk to unseal Docket Nos. 16-1 and 17-1 because defendants improperly filed those documents under seal.

**BACKGROUND**

John Doe and Robert Roe are a gay couple who have been in a "committed, but discreet," relationship for 33 years, and who were married in California in 2013. Compl. ¶ 14. Doe is a United States citizen and California resident who lives in Riyadh, Saudi Arabia most of the year, where he works for a company as legal counsel. *Id*. ¶ 13. Roe is a Saudi Arabian citizen who, until May 2021, was living full-time in Riyadh and working as a result estate investor. *Id.* ¶ 12. Since 1989, Doe and Roe lived together in Saudi Arabia, but they were forced to keep their relationship and sexual orientation hidden because homosexuality has been treated as a capital offense in Saudi

Arabia. *Id.* ¶¶ 15-16. "Living very carefully, they successfully kept their 33-year relationship a secret from the government, strangers, employers, friends, and family, alike." *Id.* ¶ 16.

Prior to the COVID-19 pandemic, Doe and Roe frequently visited California, where Doe owned a property in Moss Beach, California. *Id.* ¶¶ 5, 6, 13. Due to COVID-19 travel restrictions in place during 2020 and early 2021, the United States did not allow non-citizen travelers from Saudi Arabia into the United States. This policy precluded Doe and Roe from traveling together to the United States because Roe is not a U.S. citizen. *Id.* ¶ 20. In or around May 2021, the United States opened its borders to non-citizen travelers coming from Saudi Arabia if the traveler was the immediate family member of a United States citizen. *Id.* Doe and Roe were excited about the prospect of returning to California together after not having been able to visit for over a year due to the United States' COVID-19 entry restrictions. Doe and Roe booked round-trip, first-class airfare tickets through Lufthansa's website to fly on May 25, 2021 from Riyadh to San Francisco, with a layover in Frankfurt, Germany. *Id.* ¶ 21. Doe and Roe booked their tickets separately, as they always did, to "avoid documenting their togetherness." *Id.*

Doe and Roe specifically chose to fly with Lufthansa over Middle East-based airlines because they "reasonably expected that a German airline would be discreet in handling the confirmation of Doe and Roe's marital status for U.S. immigration entry requirements and would not share such information with the Saudi government." *Id*. In order to access Lufthansa's website and to purchase their tickets, plaintiffs had to agree to Lufthansa's terms and conditions, which include its Privacy Policy and a "Data Protection and Information" page. Those policies state that as a data processor based in the European Union, Lufthansa "process[es] personal data in accordance with the provisions of the EU General Data Protection Regulation (GDPR) and the German Federal Data Protection Act (BDSG)." *Id*. ¶ 19. Lufthansa also states that it "process[es] personal data to fulfill contractual obligations under the art. 6(1), sub. 1(b)" of the GDPR, including "managing check-in processes from check-in invitation, through the entry documents check" and "collecting and transmitting contact details required by the local authorities based on mandatory statutory regulations[.]" *Id*. The scope of data processing permitted under GDPR Article 6, subpart 1(b), is limited in relevant part to processing only information "necessary for the performance of a contact

to which the data subject is party." *Id.* Plaintiffs allege that "Lufthansa's privacy policy assures customers that its data, if transmitted, will be transmitted securely to the intended recipient." *Id.*

When Doe and Roe arrived at the King Khalid International Airport in Riyadh to check in for their flight, the Lufthansa check-in agent "demanded that Roe, as a Saudi citizen, identify his familial relationship with a United States citizen as a condition to check in for his flight." *Id.* ¶ 22. Roe identified the most senior station agent Lufthansa had on duty – Deputy Station Chief Iqbal Jamshed – who plaintiffs are informed and believe is a Pakistani Muslim. Roe believed that the most senior Lufthansa agent would be the most likely employee to be familiar with and understand the importance of following Lufthansa's data privacy policies. *Id.* Roe pulled Jamshed aside and "[d]iscreetly and quietly" told Jamshed that he and Doe were married. *Id*. ¶ 24. Jamshed responded by declaring "loudly enough so others around could hear, that he could not believe that Roe and Doe – two men, and one a Saudi Arabian citizen – were married." *Id*. ¶ 25. Doe then showed Jamshed a copy of their marriage certificate. *Id*. ¶ 26. Jamshed "continued to publicly demean and question Plaintiffs about their relationship solely because they were gay," and stated that he needed supervisorial approval from Lufthansa's corporate headquarters before allowing Roe and Doe to check in and board their flight (which plaintiffs allege on information and belief was not true). *Id.* ¶¶ 26-27.

Jamshed then returned to the Lufthansa check-in counter and spoke in Urdu with another Lufthansa employee. *Id*. ¶ 27. "Based on the immediately prior exchange with Jamshed, as well as the other agent's body language and reaction (*e.g.*, looking at Plaintiffs with wide, unapproving eyes), it was clear to Doe and Roe that Jamshed and the agent were talking about them, their sexual orientation, and their marriage." *Id*. Doe and Roe returned to the check-in area, and spoke again with Jamshed. *Id*. ¶ 28. At this point, approximately 45 minutes had elapsed. *Id.* In English, and in the presence of other customers, employees, and passersby, Jamshed "loudly exclaimed, 'So you two men are married?'" *Id*. Jamshed and other Lufthansa employees and agents began speaking in English about Doe, Roe and their relationship. *Id*. ¶ 29. Jamshed told Doe and Roe that he needed copies of their passports and marriage certificate and Roe's visa so he could email the documents to Lufthansa's headquarters in Germany. *Id*.

3

Jamshed then took Doe to Lufthansa's primary office at the airport terminal to collect the documents and forward them to Lufthansa's headquarters. *Id*. Doe repeatedly explained to Jamshed how sensitive and confidential their sexual orientation and marital status were to him and Roe, and Doe "even confessed to Jamshed that he worried the Saudi Arabian government might intercept electronic communications sent between Lufthansa's office in Saudi Arabia and its corporate headquarters in Germany." *Id*. ¶ 30.[1] Doe's complaints and worries "were ignored by Lufthansa and its employees and agents, and indeed Jamshed responded by asking if Doe was threatening him." *Id*.

Doe was held in Lufthansa's office while he waited for approval from Lufthansa headquarters. *Id*. ¶ 31. Doe asked Jamshed multiple times to call Lufthansa's Riyadh station chief, a German national, because Doe was worried about the confidential status of the documents, the disclosures of their sexual orientation and marital status that had already occurred, and that they might miss their flight. *Id*. Jamshed eventually reached the Lufthansa Riyadh station chief, who refused to talk to Doe. *Id*. Doe waited in the Lufthansa office for an hour, and then "immediately prior to the departure of Doe and Roe's flight, they were allowed to board the flight." *Id*. ¶ 32.

Once on board, Doe and Roe immediately took steps to try to mitigate the damage from Lufthansa's disclosures. Doe spoke with Lufthansa's purser and explained what happened at the Riyadh airport, and both the purser and captain told Doe that the captain contacted Lufthansa's global security team via telex, and that "Lufthansa's station chief in Riyadh had been told by the global security team that Doe and Roe's information was confidential and that it would be deleted from Lufthansa's computers immediately." *Id*. ¶ 34. Doe also asked the captain and purser to ensure that a Lufthansa employee met him and Roe upon arrival in Frankfurt so they could make a proper complaint about Lufthansa's conduct in Riyadh. *Id*. ¶ 35. Despite that request, upon landing in Frankfurt Doe and Roe were not met by any Lufthansa agent and were unable to file a formal complaint at that time. *Id*.

---

[1] Plaintiffs allege on information and belief that the Saudi Arabian government has an "extensive network of informants who will report any 'deviant' or anti-regime activities to the government, as well as sophisticated monitoring of email and other electronic forms of communication." *Id*. ¶ 17.

4

On the second flight from Frankfurt to San Francisco, Doe continued to pursue immediate mitigation efforts. *Id.* ¶ 36. He spoke with Lufthansa's purser on board, and the purser spoke with the captain, who sent another telex to Lufthansa's global security team in Germany. *Id.* "Plaintiffs were later told during their flight that their electronically transmitted information – passports, visas, marriage certificate, and any evidence suggesting Plaintiffs' relationship, marital status and/or sexual orientation – had been destroyed." *Id.* The captain also sent a telex to Lufthansa's agents and employees in San Francisco, asking for someone to meet Doe and Roe when they landed so they could lodge a complaint. *Id.* When Doe and Roe landed in San Francisco, they were met by a Lufthansa agent who assured them that a Lufthansa agent based in New York would call them within the hour; plaintiffs never received that call. *Id.* ¶ 37.

Plaintiffs allege that information regarding their sexual orientation was transmitted to the Saudi Arabian government. *Id.* ¶¶ 42-43. The Saudi Arabian government maintains online profiles for all citizens and permanent residents which includes, among other information, identification of a person's marital status. *Id.* ¶ 43. Prior to May 25, 2021, Doe's marital status had consistently been identified as "single," but sometime between May 25 and late June 2021, his status was changed to "married." *Id.* "Aside from Lufthansa's unlawful and reckless disregard for Roe and Doe's privacy, there is no conceivable way the Saudi Arabian government could have learned about Plaintiffs' marriage other than as a result of the incident described herein." *Id.*

Roe has not returned to Saudi Arabia since the May 25, 2021 flight for fear of harsh penalties faced by Saudi citizens for being gay, "with the most lenient punishment being the revocation of his passport and inability to ever leave Saudi Arabia, and escalating to potential harassment of his family, imprisonment, or the risk of being executed because of his sexual orientation and relationship with Roe." *Id.* ¶ 44. Doe has inquired of high-ranking officials at the United States consulate as to whether it might be safe for Roe to return to Saudi Arabia, and they have "unanimously concurred" that Roe's safety cannot be assured if he were to return. *Id.* ¶ 47. Roe was forced to quickly and at great expense obtain a vista that allowed him to legally remain in the United States instead of returning home to Saudi Arabia. *Id.* In January 2023, Roe received a provisional green card for permanent residency in the United States, and he hopes to become a

5

United States citizen so that he may remain indefinitely in the United States. *Id.*

Roe and Doe live with the uncertainty of whether Roe will be permitted to remain in the United States or if he will be required to leave and live elsewhere. *Id.* ¶ 45. Since leaving Saudi Arabia, Roe has not seen his family, who all live in Saudi Arabia. *Id.* ¶ 46. Doe, as a U.S. citizen, has been and will be able to return for work in Saudi Arabia with less risk of severe government retribution. *Id.* ¶ 51. Nevertheless, "Doe still fears that his sexual orientation and marital status will cost him his job, result in public shaming, and potential permanent deportation from Saudi Arabia." *Id.* Because Doe works in Saudi Arabia and Roe cannot return to Saudi Arabia, they are separated for significant parts of the year, causing both great emotional distress and requiring substantial expenditures in additional airline tickets each year so the couple can see each other. *Id.*[2]

Plaintiffs filed this lawsuit on July 14, 2021, in San Francisco Superior Court. The complaint is brought against Deutsche Lufthansa Aktiengesellschaft ("Lufthansa AG"), a corporation registered under the laws of Germany with its principal place of business in Germany, and Lufthansa Group Business Services New York LLC ("LGBS"), a limited liability corporation registered under the laws of Delaware with its principal place of business in New York. *Id.* ¶¶ 7-8. Lufthansa AG operated plaintiffs' flights between Saudi Arabia and California, and LGBS provides business services for Lufthansa AG, including IT services. *Id.*

Lufthansa AG is registered to do business in California and has an agent for service of process in California. Lufthansa AG regularly operates flights between Saudi Arabia and California, and regularly operates flights to and from San Francisco, Los Angeles, and San Diego. Lufthansa AG has offices in the SFO and LAX airports, and has 41 employees in California. LGBS is registered to do business in California and has an agent for service of process in California. LGBS has at least one employee based in California.[3]

---

[2] At the hearing on defendants' motions, plaintiffs' counsel stated that Roe had developed a serious and potentially terminal medical condition that was triggered by the stress he has experienced as a result of the incidents described in the complaint.

[3] Defendants have filed the declarations of James Stevens in support of both motions to dismiss, and those declarations contain additional information about defendants' contacts, or lack thereof, in California. Dkt. Nos. 16-1, 17-1. Mr. Stevens states he is employed by "Lufthansa Group" as Legal Counsel for the Americas, and that in the course of his employment he is fully

6

1  The complaint asserts five causes of action under California law: (1) Public Disclosure of Private Facts; (2) Intentional Infliction of Emotional Distress; (3) Breach of Contract; (4) Negligent Infliction of Emotional Distress; and (5) Loss of Consortium/Civ. Code § 1431.2l.  On August 25, 2023, defendants removed the complaint to this Court, invoking diversity jurisdiction and federal question jurisdiction based upon preemption of plaintiffs' claims by The Montreal Convention, formally known as the Convention for the Unification of Certain Rules for International Air Carriage by Air, May 28, 1999 (entered into force on November 4, 2003), reprinted in S. Treaty Doc. No. 106-45, 1999 WL 33292734.

Now before the Court are defendants' motions to dismiss the complaint based on lack of personal jurisdiction, and alternatively for judgment on the pleadings.

**LEGAL STANDARD**

A defendant may move to dismiss the complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).  Upon defendant's motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  In determining whether the plaintiff has met this burden, a district court may consider evidence contained in affidavits and discovery materials. *Data Disc, Inc. v. Sys. Tech. Assoc.*, Inc., 557 F.2d 1280, 1285 (9th Cir. 1977).  However, when a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need only make "a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  Where undisputed, a district court must take as true the plaintiff's version of the facts. *Am. Tel. & Tel. Co.*

---

familiar with the operations of both Lufthansa AG and LGBS in the United States, including in California. Plaintiffs have objected to various statements in the Smith declarations on numerous grounds, including lack of foundation and lack of personal knowledge. The Court finds it unnecessary to resolve the parties' dispute about the Smith declarations because the Court does not rely on those declarations in reaching its conclusion that the Court lacks personal jurisdiction over defendants.

The Court also notes that defendants improperly filed the Stevens Declarations under seal, with no accompanying motions to file under seal (and nothing in the declarations appears confidential). The Court directs the Clerk to unseal Dkt. Nos. 16-1 and 17-1.

*v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (citations omitted). Conversely, "conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a *prima facie* case for personal jurisdiction exists." *Id.*

**DISCUSSION**

Defendants contend that this Court lacks personal jurisdiction over them because neither is domiciled in California and all of the alleged tortious activity and breach of contract occurred in Riyadh, Saudi Arabia. LGBS further argues that it has no connection whatsoever to the events alleged in the complaint and notes that all of the factual allegations in the complaint relate to Lufthansa AG and its employees, not to LGBS.

Where there is no applicable federal statute that governs personal jurisdiction, courts "properly exercise personal jurisdiction over a defendant 'if it is permitted by [the state's] long-arm statute and if the exercise of jurisdiction does not violate federal due process.'" *Autodesk, Inc. v. Kobayashi + Zedda Architects, Ltd.*, 191 F. Supp. 3d 1007, 1013 (N.D. Cal. 2016) (quoting *Pebble Beach Co.*, 453 F.3d at 1154). Since "California's long-arm statute allows the exercise of personal jurisdiction to the fullest extent permissible under the U.S. Constitution," the district court need only determine whether the exercise of jurisdiction comports with federal due process requirements. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). A district court's exercise of personal jurisdiction comports with due process when the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Personal jurisdiction is either general or specific. "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic" as to render them essentially at home in the forum State.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). A corporation is "essentially at home" in its place of incorporation and principal place of business. *Id.* at 924. Plaintiffs do not contend that Lufthansa AG or LGBS is subject to general jurisdiction in California.

8

1      Specific jurisdiction "covers defendants less intimately connected with a State, but only as

2 to a narrower class of claims." *Ford Motor Company v. Montana Eighth Judicial District Court*,

3 592 U.S. 351, 359 (2021). The Ninth Circuit has articulated three requirements for establishing

4 specific jurisdiction over a non-resident defendant:

5      (1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2)
6      the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and
7      substantial justice, i.e. it must be reasonable.

8 *Axiom Foods, Inc. v. Acerchem Int'l, Inc*., 874 F.3d 1064, 1068 (9th Cir. 2017) (alterations and

9 quotations omitted).

10      The plaintiff bears the burden of satisfying the first two prongs of the test, and if the plaintiff

11 fails to satisfy either prong, then the district court does not have personal jurisdiction over the

12 defendant. *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004). If the

13 plaintiff satisfies both prongs, then the burden shifts to the defendant to present a "compelling case"

14 that the exercise of jurisdiction would not be reasonable under the third prong. *Burger King Corp.*

15 *v. Rudzewicz*, 471 U.S. 462, 476–78 (1985). All three prongs of the test must be met for the district

16 court to exercise personal jurisdiction over the defendant.

17

18      **A.    Purposeful Availment or Purposeful Direction**

19      "Under the first prong of our three-part analysis, to be subject to specific jurisdiction the

20 defendant must purposefully direct its activities toward the forum state, purposefully avail itself of

21 the privileges of conducting activities there, or engage in 'some combination thereof.'" *Impossible*

22 *Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023) (quoting *Yahoo! Inc. v. La*

23 *Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d at 1199, 1206 (9th Cir. 2006)). "When a

24 defendant's conduct primarily occurs outside the forum state, we generally apply the purposeful

25 direction test and look to whether the defendant expressly aimed acts at the forum state knowing

26 that they would harm the plaintiff there." *Id*. at 1088. "Purposeful availment, meanwhile, is

27 satisfied when the defendant has taken deliberate action within the forum state or . . . has created

28 continuing obligations to forum residents." *Id.* (internal citation and quotations omitted).

1    "Purposeful availment generally provides a more useful frame of analysis for claims sounding in

2    contract, while purposeful direction is often the better approach for analyzing claims in tort." *Global*

3    *Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir.

4    2020).  However, the Ninth Circuit has repeatedly recognized that "our cases do not impose a rigid

5    dividing line between purposeful availment and purposeful direction," and that "[a]lthough the

6    distinction between purposeful availment and direction is often a useful and appropriate doctrinal

7    table-setting device, 'there's no need to adhere to [this] iron-clad doctrinal dichotomy' in every

8    case."   *Impossible Foods*, 80 F.4th at 1088-89 (citing cases and quoting *Davis v. Cranfield*

9    *Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023)).

10      Defendants contend that the purposeful direction test is appropriate here because plaintiffs'

11   claims sound in tort, and they argue that plaintiffs cannot satisfy this test because Lufthansa AG's

12   agents in Riyadh did not expressly aim acts at California because all of the conduct at issue occurred

13   at the Riyadh airport.  Plaintiffs do not explicitly address the question of which test applies, and

14   instead they argue that defendants, and especially Lufthansa AG, have purposefully availed

15   themselves of the privilege of doing business in California.

16      It is the Court's view that plaintiffs have shown that Lufthansa AG has purposefully availed

17   itself of the privilege of conducting business in California,[4] but that if the purposeful direction test

18   applies, plaintiffs have not met their burden for the reasons articulated by defendants.  However, the

19   Court finds it unnecessary to resolve this question because, even assuming plaintiffs can establish

20   the first element of specific jurisdiction, plaintiffs have failed to show that their claims arise out of

21   or relate to defendants' activities in California, as required by the next prong of the specific

22   jurisdiction analysis.

### B.    Claim Arising Out of or Related to Forum-Related Activity

The second part of the specific jurisdiction test examines whether the plaintiff's claim arises out of or relates to the defendant's forum-related activities.  The Supreme Court has instructed that,

---

[4] As discussed below, all of the factual allegations in the complaint relate to Lufthansa AG and its employees and not to LGBS.

1    "[i]n order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation

2    between the forum and the underlying controversy, principally, [an] activity or an occurrence that

3    takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Sup. Ct. of California, San Francisco

4    Cnty.*, 582 U.S. 255, 265 (2017) (quoting *Goodyear*, 564 U.S., at 919). Two recent Supreme Court

5    decisions are illustrative.

6            In *Bristol-Myers*, the Supreme Court held that California state courts did not have specific

7    personal jurisdiction over personal injury claims brought by non-residents against Bristol-Myers

8    Squibb, the manufacturer of a nationally marketed prescription drug, Plavix. Bristol-Myers engaged

9    in business activities in California, including employing 250 sales representatives in the state as well

10   as 160 employees who worked at five California research and development facilities. Bristol-Myers

11   did not develop or manufacture Plavix in California, but between 2006-2012, it sold almost 187

12   Plavix pills in California for approximately $900 million, or a little over 1% of the company's

13   nationwide sales revenue. *Id*. at 259. The Court found that there was no connection between the

14   non-resident plaintiffs' personal injury claims and the defendant's activities in California because

15   the plaintiffs did not live in California, had not been prescribed the medication in California, had

16   not ingested the medication in California, and were not injured in that state. *Id*. at 264-65. The

17   Court found that "all of the conduct giving rise to the nonresident's claims occurred elsewhere." *Id*.

18   at 265 (citing *Walden v. Fiore*, 571 U.S. 277, 291 (2014) (holding Nevada state court did not have

19   personal jurisdiction over a Georgia resident defendant based on allegedly unlawful search of the

20   Nevada resident plaintiffs while they were in Georgia preparing to board a flight to Nevada)).

21           In contrast, in *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S.

22   351 (2021), the Court held that Montana and Minnesota state courts had specific jurisdiction over

23   personal injury claims brought by Montana and Minnesota residents who were injured in those states

24   by allegedly defective Ford vehicles, even though the vehicles were not designed or manufactured

25   in Montana or Minnesota, and the specific vehicles involved were not sold in those states. The

26   Court noted that Ford did substantial business in both states and that it actively sought to serve the

27   market for automobiles and related products in those states, including selling the two types of car

28   models involved in the accidents. *Id.* at 356-57. The Court rejected Ford's argument that there

11

needed to be a "strict causal relationship" between the defendant's in-state activity and the litigation:

> [O]ur most common formulation of the rule demands that the suit "arise out of or relate to the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum.

*Id*. at 362 (internal citations omitted). The Court found that Ford was subject to personal jurisdiction in Montana and Minnesota because there was a "strong relationship" between Ford, the forums and the plaintiffs' claims as "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id*. at 365.

Plaintiffs appear to concede that their claims do not "arise out of" defendants' California contacts, but they contend that their claims "relate to" defendants' contacts in California. Plaintiffs argue that the complaint alleges wrongful conduct by Lufthansa AG in California, citing Paragraphs 36-37 of the complaint. In those paragraphs, plaintiffs allege that the captain on the Frankfurt-San Francisco flight sent a telex to Lufthansa's agents and employees in San Francisco asking for someone to meet Doe and Roe at the airport so they could lodge a complaint; that when plaintiffs landed in San Francisco they were met by a Lufthansa agent who assured them that a Lufthansa agent based in New York would call them within the hour; and that plaintiffs never received that call. Plaintiffs argue that this failure to mitigate harm is relevant to their claim for public disclosure of private facts, and they contend that the commission of an intentional tort in a state is a purposeful act that will satisfy the first two elements of the minimum contacts test. Plaintiffs also argue that even if the Court disregards these allegations, plaintiffs would not have suffered their alleged injuries but for Lufthansa AG's California-related conduct because "but for" Lufthansa AG's scheduled flights from Riyadh to San Francisco, their injuries would not have occurred.

Although it is a close call, the Court concludes that plaintiffs have not demonstrated that their claims are sufficiently "related to" defendants' activities in California and thus that this Court lacks specific jurisdiction over defendants. As an initial matter, the Court notes that all of the factual allegations involve Lufthansa AG, not LGBS: plaintiffs booked their flight with Lufthansa AG, Lufthansa AG operated the flights from Riyadh to San Francisco, and all of plaintiffs' interactions

12

1   with Lufthansa employees, including Jamshed, were with Lufthansa AG employees. Plaintiffs
2   assert that the "logical import" of their allegation that LGBS "provides business services for
3   Lufthansa AG, including IT services," means that LGBS participated in or contributed to the actions
4   that form the basis of the complaint, including the training of Lufthansa personnel who interacted
5   with plaintiffs, the operation and maintenance of the computer systems on which plaintiffs' personal
6   information was stored and transmitted, and providing logistical support for the Lufthansa flights
7   taken by plaintiffs. The Court finds that this line of argument is too speculative and that plaintiffs
8   have not alleged a basis for exercising personal jurisdiction over LGBS.

9   With regard to Lufthansa AG, virtually all of the conduct giving rise to or related to
10  plaintiffs' claims occurred in Saudi Arabia. Prior to the events in question, plaintiffs were living
11  together in Saudia Arabia, they booked their flights from Saudi Arabia, plaintiffs encountered all of
12  the difficulties with the check-in process at the Riyadh airport, and the disclosure of plaintiffs'
13  marital status and sexual orientation took place at the Riyadh airport. The plaintiffs do have a
14  connection to California in that Doe is a California citizen, and Roe was forced to relocate
15  permanently to California as a result of Lufthansa's actions. However, the Supreme Court has
16  repeatedly held that the fact that a forum resident experiences harm in a forum state, on its own, is
17  not enough – there must be some conduct on the part of the defendant in the forum state that is
18  connected to the plaintiff's claims to satisfy the minimum contacts analysis. *See e.g.*, *Walden*, 571
19  U.S. at 290 ("[M]ere injury to a forum resident is not a sufficient connection to the forum.
20  Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as
21  it shows that the defendant has formed a contact with the forum State. The proper question is not
22  where the plaintiff experienced a particular injury or effect but whether the defendant's conduct
23  connects him to the forum in a meaningful way.").

24  The allegation about the SFO Lufthansa AG agent telling plaintiffs that they would be
25  contacted is too slender a reed to tether plaintiffs' claims to California. The gravamen of plaintiffs'
26  claims is that Lufthansa AG mishandled their private information during the check-in process in
27  Riyadh, not that a Lufthansa AG agent at the SFO airport promised them a follow up call that did
28  not occur. Similarly, the fact that plaintiffs were flying from Riyadh to San Francisco is not enough

13

to create the type of relationship between plaintiffs' claims and California sufficient to establish personal jurisdiction. While the Ninth Circuit has used "but for" language to describe the second prong of the specific jurisdiction analysis, those cases involve a greater nexus between the plaintiffs' claims and the defendants' contacts in the forum state. Plaintiffs rely on *Menken v. Emm*, 503 F.3d 1050 (9th Cir. 2007), in which the Ninth Circuit held that an Arizona district court had personal jurisdiction over an Arizona resident's tort claims against nonresident defendants. The court held that the plaintiff showed that "he would not have suffered an injury 'but for' [the defendants'] forum-related conduct" where the defendants recorded a Nevada judgment against the plaintiff in Arizona, established a lien on the plaintiff's Arizona house, sought to use the lien as leverage to extract more money than was due under the judgment through an exchange of letters between Nevada and Arizona, and refused to release the lien, causing the plaintiff's sale of his home to fall through. *Id*. at 1054, 1059. The Ninth Circuit noted that although the defendants' "alleged contacts are not extensive," the plaintiff's causes of action all arose out of the defendants' "particular purposeful" contacts with the forum state. *Id*. at 1060. Here, there are no facts analogous to *Menken* because plaintiffs do not allege that Lufthansa AG did anything in California except fail to mitigate the harm caused by Jamshed's disclosure of their private information in Saudi Arabia. The Court is also not persuaded that the fact that San Francisco was the destination of plaintiffs' flight is enough to tie the conduct that occurred in Saudi Arabia to California in light of the Supreme Court's caution in *Ford Motor Company*, that "the phrase 'relate to' incorporates real limits." *Ford Motor Co.*, 592 U.S. at 361.

Plaintiffs also cite *Bugarin v. All Nippon Airways Co*., 513 F. Supp. 3d 1172 (N.D. Cal. 2021). In *Bugarin*, a California resident filed a nationwide class action against All Nippon Airlines, a Japanese corporation, alleging that All Nippon breached its conditions of carriage by failing to issue refunds to passengers whose flights were canceled as a result of the COVID-19 pandemic. The named plaintiff had purchased a roundtrip ticket in California to travel from San Jose to Japan. Judge Freeman held that there was personal jurisdiction over the named plaintiff's claims[5] because

---

[5] Judge Freeman also noted that All Nippon had abandoned its personal jurisdiction challenge to the named plaintiffs' claims. *Id*. at 1186-87.

1  All Nippon had purposefully availed itself of the privilege of conducting business in California, the
2  contract of carriage was between All Nippon and the California resident named plaintiff, and that
3  the plaintiff's claims arose out of All Nippon's cancelation of a flight scheduled to fly into the forum.
4  *Id.* at 1186-87.[6] *Bugarin* is distinguishable because here, plaintiffs were living in Saudi Arabia when
5  they purchased their airline tickets and all, or almost all, of the conduct giving rise to plaintiffs'
6  claims occurred in Saudi Arabia.

7  Plaintiffs have not cited any cases in which courts have found specific personal jurisdiction
8  based on almost entirely foreign conduct, and the Court's research has not located any such
9  authority. Although "relate to" is broader than "arises out of," it is the Court's conclusion that it is
10  not broad enough to encompass plaintiffs' claims here.

### C. Reasonableness

As discussed above, the Court finds that plaintiffs have not met their burden to show that this Court has specific personal jurisdiction over defendants. However, even if the Court were to find that plaintiffs had met their burden, it is the Court's view that under the particular facts of this case, the exercise of jurisdiction would be unreasonable.[7] To determine whether the exercise of jurisdiction over a defendant is reasonable, a district court must consider:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs[,] (2) the burden on the defendant of defending in the forum[,] (3) the extent of conflict with the sovereignty of the defendant's home state[,] (4) the forum state's interest in adjudicating the dispute[,] (5) the most efficient judicial resolution of the controversy[,] (6) the importance of the forum to the plaintiff's interests in convenient and effective relief[,] and (7) the existence of an alternative forum.

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir. 2002).

---

[6] Plaintiffs also cite *Selke v. Germanwings GmbH*, 261 F. Supp. 3d 645 (E.D. Va. 2017), in which a district court held that it had personal jurisdiction over Lufthansa AG in a case brought by the survivors of family members who died in a plane crash in Europe. However, in *Selke*, the airline tickets were purchased in Virginia, and thus there was at least some conduct related to the claim that occurred in the forum.

[7] The Court recognizes that defendants have the burden to show unreasonableness, and that defendants did not address this factor in any meaningful way in their motions and only addressed the reasonableness factors in their reply briefs.

15

Of greatest concern to the Court are the third and fifth factors. The Ninth Circuit has cautioned that "[o]ne of the goals of minimum contacts analysis is 'to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'" *Paccar Int'l, Inc. v. Com. Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1065 (9th Cir. 1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). This case contains significant "foreign policy overtones," as plaintiffs claim that the Saudi Arabian government learned of their marital status through covert monitoring of Lufthansa's emails and/or through the use of an informant system. *See id.* (reversing district court and finding no personal jurisdiction over claims against Kuwaiti bank based on unreasonableness where district court downplayed "foreign policy overtones"). In addition, assuming plaintiffs' claims were not preempted,[8] plaintiffs' breach of contract claim would require this Court to interpret European and German data privacy laws, the EU General Data Protection Regulation (GDPR) and the German Federal Data Protection Act (BDSG). In addition, the Court would be required to evaluate, under a choice-of-law analysis,[9] whether plaintiffs could proceed under California law, and if they could, the Court would be required to apply California law regarding public disclosure of private facts and

---

[8] Defendants alternatively contend that plaintiffs' claims are preempted by the Montreal Convention and the Airline Deregulation Act, a contention that the Court did not find persuasive, at least at this preliminary stage of the litigation.

[9] Defendants' alternative motion for judgment on the pleadings contends plaintiffs' state law claims must be dismissed pursuant to the canon of statutory construction known as the presumption against extraterritoriality. However, that doctrine involves the application of statutes, not common law. When federal subject-matter jurisdiction is based on the parties' diversity of citizenship, as it is here, the Court applies the choice-of-law principles of the forum state to determine the governing law. *See Bassidji v. Goe*, 413 F.3d 928, 933 (9th Cir. 2005) (applying California's choice-of-law rules to determine whether Hong Kong or California law applied to breach of contract claim); *Stud v. Trans Intern. Airlines*, 727 F.2d 880, 881 (9th Cir. 1984 ("Because our jurisdiction is based not simply on the existence of a federal question under the version of the Warsaw Convention in force in the United States, but on diversity of citizenship as well, . . . we use the choice of law rules in California, the state in which this action was filed, to determine the applicable law."); *cf. also Cassirer v. Thyssen-Bornemisza Collection Foundation*, 596 U.S. 107, 109, 115 (2022) (holding that when a foreign state is not immune from suit, courts should apply "whatever choice-of-law rule the court would use if the defendant were not a foreign-state actor, but instead a private party," which in a case involving only common law claims, "means applying the forum State's choice-of-law rule, not a rule deriving from federal common law," and thus lower courts erred in not applying California choice-of-law rules to determine whether California or Spanish law applied to suit seeking recovery of painting confiscated by the Nazis and later purchased by Spanish museum).

what constitutes "outrageous" behavior to conduct that occurred in Saudi Arabia, a society with very different societal and cultural norms.

As to the fifth factor – efficiency – the Court has serious concerns about how this litigation would proceed. In addition to the choice-of-law issues mentioned above, discovery would be extremely complicated, as plaintiffs would seek to prove a causal link between Lufthansa AG's disclosure of their marital status and sexual orientation and the Saudi Arabian government's changing of Doe's status from "single" to "married." Further, some discovery would presumably take place in Germany regarding Lufthansa AG's privacy and data policies.

The Court is sympathetic to plaintiffs' assertion that California is the only practical venue for them to pursue their claims, and the allegations of the complaint, taken as true, are quite problematic. However, in light of all of the foregoing, the Court concludes that this Court lacks personal jurisdiction over defendants and that the exercise of jurisdiction would be unreasonable.

### D. Jurisdictional Discovery

Plaintiffs have requested leave to take jurisdictional discovery. All of the discovery identified by plaintiffs concerns defendants' general contacts in California,[10] and none of the proposed discovery would buttress the specific connection between plaintiffs' claims and this forum. Accordingly, the Court finds that the proposed discovery would be futile and DENIES the request for discovery.

### CONCLUSION

For the foregoing reasons, the Court concludes that it lacks personal jurisdiction over defendants, and GRANTS defendants' motions to dismiss for lack of personal jurisdiction. Because

---

[10] Plaintiffs state that they would seek the following: "information on the number of California residents who purchased Lufthansa tickets over the last five years; the number of persons who have embarked on and disembarked from Lufthansa flights at SFO and LAX over the last five years; the revenues generated by flights originating or terminating at SFO and LAX over the last five years; all contracts entered into between Lufthansa AG (or LGBS) with service providers and other vendors concerning Lufthansa AG's operations at SFO and LAX, along with amounts paid, over the last five years; amounts paid to SFO and LAX over the last five years; and similar information." Pls' Opp'n at 9 (Dkt. No. 26).

the Court agrees that it lacks personal jurisdiction over defendants, the Court does not address defendants' alternative arguments for dismissal.

**IT IS SO ORDERED**.

Dated: March 29, 2024

_____
SUSAN ILLSTON
United States District Judge