UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOE, et al.,

            Plaintiffs,

    v.

DEUTSCHE LUFTHANSA
AKTIENGESELLSCHAFT, et al.,

            Defendants.

Case No.  23-cv-04413-SI

**ORDER GRANTING PLAINTIFFS'
MOTION FOR LEAVE TO FILE FIRST
AMENDED COMPLAINT**

Re: Dkt. No. 61

Plaintiffs John Doe and Robert Roe move for leave to amend their complaint.  Dkt. No. 61 (Mot.).  Defendant Deutsche Lufthansa Aktiengesellschaft ("Lufthansa") filed an opposition, and plaintiffs filed a reply.[1]  Dkt. No. 63 (Opp'n); Dkt. No. 64 (Reply).  Pursuant to Civil Local Rule 7-1(b), the Court found this matter suitable for disposition without oral argument and vacated the May 1, 2026  hearing.  Dkt. No. 65.  For the reasons set forth below, the Court GRANTS plaintiffs' motion.

**BACKGROUND**

**I.    Allegations of the Complaint**

Doe and Roe are a gay couple who have been in a committed relationship for 33 years and married since 2013.  Dkt. No. 1-1 (Compl.) ¶¶ 1, 14.  Roe and Doe are Saudi Arabian and United States citizens, respectively.  *Id.* ¶¶ 5–6, 12.  Since 1989, plaintiffs have lived together in Saudi Arabia, which does not recognize same-sex marriages and treats homosexuality as a capital offense.

---

[1] The proposed FAC drops defendant Lufthansa Group Business Services New York LLC ("LGBS") as a defendant.  Dkt. No. 62-1 ¶ 8 (redlined proposed FAC).  LGBS did not file an opposition or join in Lufthansa's.

*Id.* ¶¶ 15–16. Plaintiffs thus keep their "relationship a secret from the government, strangers, employers, friends, and family" in order to remain safe and to work and live in Saudi Arabia. *Id.* ¶ 16.

Due to COVID-19 travel restrictions, the United States did not allow non-citizen travelers from Saudi Arabia into the United States for over a year. *Id.* ¶ 20. This policy precluded Doe and Roe from traveling together to the United States because Roe is not a U.S. citizen. *Id.* In or around May 2021, the United States opened its borders to non-citizen travelers coming from Saudi Arabia if the traveler was the immediate family member of a United States citizen. *Id.* Doe and Roe were excited about the prospect of returning to California together after not having been able to visit for over a year due to the United States' COVID-19 entry restrictions. *Id.* ¶ 21. Plaintiffs booked round-trip, first-class airfare tickets through Lufthansa's website to fly from Riyadh on May 25, 2021 to San Francisco, with a layover in Frankfurt, Germany. *Id.* Plaintiffs booked their tickets separately, as they always did, to "avoid documenting their togetherness." *Id.* Plaintiffs specifically chose to fly with Lufthansa over a Middle East-based airlines because they "reasonably expected that a German airline would be discreet in handling the confirmation of Doe and Roe's marital status for U.S. immigration entry requirements and would not share such information with the Saudi government." *Id.*

When plaintiffs arrived at the King Khalid International Airport in Riyadh to check in for their flight, the Lufthansa check-in agent "demanded that Roe, as a Saudi citizen, identify his familial relationship with a United States citizen as a condition to check in for his flight." *Id.* ¶ 22. Roe identified the most senior station agent Lufthansa had on duty, Deputy Station Chief Iqbal Jamshed, whom "Roe reasonably believed . . . would be the most likely employee present to be familiar with and understand the importance of following Lufthansa's data privacy policies. *Id.* ¶ 23. Roe pulled Jamshed aside and "[d]iscreetly and quietly" told Jamshed that he and Doe were married. *Id.* ¶ 24. Jamshed responded by "declar[ing], loudly enough so others around could hear, that he could not believe that Roe and Doe—two men, and one a Saudi Arabian citizen—were married." *Id.* ¶ 25.

Doe then "showed Jamshed a copy of their marriage certificate to corroborate Roe's oral

2

declaration that he and Doe were married." *Id*. ¶ 26. Jamshed "continued to publicly demean and question Plaintiffs about their relationship solely because they were gay," and stated that he needed supervisorial approval from Lufthansa's corporate headquarters before allowing Roe and Doe to check in and board their flight (which plaintiffs allege on information and belief was not true). *Id*. ¶¶ 26–27.

Jamshed then returned to the Lufthansa check-in counter and spoke in Urdu with another Lufthansa employee. *Id*. ¶ 27. "Based on the immediately prior exchange with Jamshed, as well as the other agent's body language and reaction (*e.g.*, looking at Plaintiffs with wide, unapproving eyes), it was clear to Doe and Roe that Jamshed and the agent were talking about them, their sexual orientation, and their marriage." *Id*. After approximately 45 minutes had elapsed, Doe and Roe returned to the check-in area and spoke again with Jamshed. *Id*. ¶ 28. In English, and in the presence of other customers, employees, and passersby, Jamshed "loudly exclaimed, 'So you two men are married?'" *Id*. Jamshed and other Lufthansa employees and agents began speaking in English about Doe, Roe, and their relationship. *Id*. ¶ 29. Jamshed told Doe and Roe that he needed copies of their passports and marriage certificate, as well as Roe's visa, so he could email the documents to Lufthansa's headquarters in Germany. *Id*.

Jamshed then took Doe to Lufthansa's primary office at the airport terminal to collect the documents and forward them to Lufthansa's headquarters. *Id*. Doe repeatedly explained to Jamshed how sensitive and confidential their sexual orientation and marital status were to him and Roe, and Doe "even confessed to Jamshed that he worried the Saudi Arabian government might intercept electronic communications sent between Lufthansa's office in Saudi Arabia and its corporate headquarters in Germany." *Id*. ¶ 30.[2] Doe's complaints and worries "were ignored by Lufthansa and its employees and agents, and indeed Jamshed responded by asking if Doe was threatening him." *Id*.

Doe was held in Lufthansa's office while he waited for approval from Lufthansa

---

[2] Plaintiffs allege on information and belief that the Saudi Arabian government has an "extensive network of informants who will report any 'deviant' or anti-regime activities to the government, as well as sophisticated monitoring of email and other electronic forms of communication." Compl. ¶ 17.

United States District Court
Northern District of California

headquarters. *Id*. ¶ 31. Doe asked Jamshed multiple times to call Lufthansa's Riyadh station chief, a German national, because Doe was worried about the confidential status of the documents, the disclosures of their sexual orientation and marital status that had already occurred, and that they might miss their flight. *Id*. Jamshed eventually reached the Lufthansa Riyadh station chief, who refused to talk to Doe. *Id*. Doe waited in the Lufthansa office for an hour, and then "immediately prior to the departure of Doe and Roe's flight, they were allowed to board the flight." *Id*. ¶ 32.

Once on board, plaintiffs immediately took steps to try to mitigate the damage from Lufthansa's disclosures. *Id.* ¶ 33. Doe spoke with Lufthansa's purser and explained what happened at the Riyadh airport, and both the purser and captain told Doe that the captain contacted Lufthansa's global security team via telex, and that "Lufthansa's station chief in Riyadh had been told by the global security team that Doe and Roe's information was confidential and that it would be deleted from Lufthansa's computers immediately." *Id*. ¶ 34. Doe also asked the captain and purser to ensure that a Lufthansa employee meet him and Roe upon arrival in Frankfurt so they could make a proper complaint about Lufthansa's conduct in Riyadh. *Id*. ¶ 35. Despite that request, upon landing in Frankfurt Doe and Roe were not met by any Lufthansa agent and were unable to file a formal complaint at that time. *Id*.

On the second flight from Frankfurt to San Francisco, Doe continued to pursue to immediate mitigation efforts. *Id*. ¶ 36. He spoke with Lufthansa's purser on board, and the purser spoke with the captain, who sent another telex to Lufthansa's global security team in Germany. *Id*. "Plaintiffs were later told during their flight that their electronically transmitted information—passports, visas, marriage certificate, and any evidence suggesting Plaintiffs' relationship, marital status and/or sexual orientation—had been destroyed." *Id*. The captain also sent a telex to Lufthansa's agents and employees in San Francisco, asking for someone to meet Doe and Roe when they landed so they could lodge a complaint. *Id*. When Doe and Roe landed in San Francisco, they were met by a Lufthansa agent who assured them that a Lufthansa agent based in New York would call them within the hour; plaintiffs never received that call. *Id*. ¶ 37.

Plaintiffs allege that information regarding their sexual orientation was transmitted to the Saudi Arabian government. *Id*. ¶¶ 42–43. The Saudi Arabian government maintains online profiles

4

for all citizens and permanent residents which includes, among other information, identification of a person's marital status. *Id*. ¶ 43. Prior to May 25, 2021, Doe's marital status had consistently been identified as "single," but sometime between May 25 and late June 2021, his status was changed to "married." *Id*. "Aside from Lufthansa's unlawful and reckless disregard for Roe and Doe's privacy, there is no conceivable way the Saudi Arabian government could have learned about Plaintiffs' marriage other than as a result of the incident described herein." *Id*.

Roe has not returned to Saudi Arabia since the May 25, 2021 flight for fear of harsh penalties faced by Saudi citizens for being gay, "with the most lenient punishment being the revocation of his passport and inability to ever leave Saudi Arabia, and escalating to potential harassment of his family, imprisonment, or the risk of being executed because of his sexual orientation and relationship with Roe." *Id*. ¶ 44. Doe has inquired of high-ranking officials at the United States consulate as to whether it might be safe for Roe to return to Saudi Arabia, and they have "unanimously concurred" that Roe's safety cannot be assured if he were to return. *Id*. ¶ 47. Roe was forced to quickly and at great expense obtain a vista that allowed him to legally remain in the United States instead of returning home to Saudi Arabia. *Id*. In January 2023, Roe received a provisional green card for permanent residency in the United States, and he hopes to become a United States citizen so that he may remain indefinitely in the United States. *Id*.

Roe and Doe live with the uncertainty of whether Roe will be permitted to remain in the United States or if he will be required to leave and live elsewhere. *Id*. ¶ 45. Since leaving Saudi Arabia, Roe has not seen his family, who all live in Saudi Arabia. *Id*. ¶ 46. Doe, as a U.S. citizen, has been and will be able to return for work in Saudi Arabia with less risk of severe government retribution. *Id*. ¶ 51. Nevertheless, "Doe still fears that his sexual orientation and marital status will cost him his job, result in public shaming, and potential permanent deportation from Saudi Arabia." *Id*. Because Doe works in Saudi Arabia and Roe cannot return to Saudi Arabia, they are separated for significant parts of the year, causing both great emotional distress and requiring substantial expenditures in additional airline tickets each year so the couple can see each other. *Id*.

///

## II.    Procedural Background

On July 23, 2023, plaintiffs filed this action in the Superior Court of California, County of San Francisco. *See* Compl.  Plaintiffs assert state law claims for public disclosure of private facts, intentional infliction of emotional distress, breach of contract, negligent infliction of emotional distress, and loss of consortium pursuant to California Civil Code section 1431.2. *Id.* ¶¶ 52–80.

Defendants removed the action to this Court on August 25, 2023.  Dkt. No. 1 (Notice of Removal).  On March 29, 2024, the Court dismissed the action for lack of personal jurisdiction. Dkt. No. 37.  Plaintiffs appealed, and, on October 30, 2025, the Ninth Circuit reversed and remanded, holding that there is specific personal jurisdiction over Lufthansa and LGBS in California. Dkt. No. 55.  The Ninth Circuit's mandate issued on March 2, 2026.  Dkt. No. 60.

Plaintiffs seek leave to file a first amended complaint ("FAC") that drops LGBS as a defendant and adds (1) new allegations regarding Roe's recent diagnosis of "a severe physical, potentially life-threatening medical condition triggered by Defendants' conduct as pleaded in the Complaint"; (2) additional damages; and (3) new facts that plaintiffs contend "will support Lufthansa's liability for discrimination, for failing to adequately train and supervise its employees and supervisors, and for failing to respond decisively and to promptly remedy such conduct, as well as Plaintiffs' claim of punitive damages against Lufthansa."  Dkt. No. 62 (Putterman Decl.) ¶¶ 3, 6; *see id.*, Ex. 1 (redlined proposed FAC) & Ex. 2 (proposed FAC).[3]  Plaintiffs' claims remain the same.

## LEGAL STANDARD

A party may amend its complaint once as a matter of course "(A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1)(A)–(B).  Once those periods have passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ.

---

[3] The Putterman Declaration was filed twice.  The first declaration was filed under seal, although it was not accompanied by a motion for leave to file under seal.  Dkt. No. 61-2; *see* Civ. L.R. 79-5(b).  The second declaration was publicly filed.  Dkt. No. 62.

P. 15(a)(2).

"When considering whether to grant leave to amend, a district court should consider several factors including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Of the *Foman* factors, prejudice to the opposing party carries the most weight." *Id.* (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)). "The court should freely give leave when justice so requires," which represents a public policy strongly in favor of amendments. *See Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("It is generally our policy to permit amendment with 'extreme liberality' . . . .").

## DISCUSSION

Lufthansa argues that amendment is futile because plaintiffs' claims are preempted by the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106–45 (the "Montreal Convention"), and because the Court lacks subject matter jurisdiction under Article 33 of the Montreal Convention. Opp'n at 2–16. Lufthansa further argues that the Court should deny leave to amend because the proposed FAC contains irrelevant and unduly prejudicial allegations regarding Lufthansa's history. *Id.* at 16.

## I.    Futility

Courts do not ordinarily consider the validity of a proposed amended pleading in deciding whether to grant leave to amend, but leave may be denied if the proposed amendment is futile or would be subject to dismissal. *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). A proposed amendment is "futile" only if no set of facts can be proved under the amendment which would constitute a valid claim or defense. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

The Montreal Convention "governs 'all international carriage of persons, baggage or cargo performed by aircraft for reward,' [and] provides the exclusive remedy for international passengers seeking damages against airline carriers." *Narayanan v. British Airways*, 747 F.3d 1125, 1127 (9th

7

Cir. 2014) (quoting Montreal Convention art. 1(1)). "The Convention preempts state-law claims that fall within this substantive scope." *Thede v. United Airlines, Inc.*, 796 F. App'x 386, 388 (9th Cir. 2020) (citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 172 (1999); Montreal Convention art. 29).

To determine whether the Montreal Convention applies, the Court must analyze "whether a passenger suffered 'a personal injury on board an aircraft or in the course of any of the operations of embarking or disembarking[.]'" *Patel v. Singapore Airlines Ltd.*, 745 F. App'x 9, 11 (9th Cir. 2018) (citation modified; quoting *Tseng*, 525 U.S. at 161). The Montreal Convention does not define "embarking" or the phrase "the course of any of the operations of embarking." "Whether a passenger is embarking or disembarking is a question of federal law to be decided on the facts of each case." *Schmidkunz v. Scandinavian Airlines Sys.*, 628 F.2d 1205, 1207 (9th Cir. 1980). The Ninth Circuit has cautioned against an "inflexible" analysis and instructs courts to evaluate "the total circumstances surrounding a passenger's injuries, viewed against the background of the intended meaning of Article 17." *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1262 (9th Cir. 1977).

Courts analyzing the question of embarkation have considered "(1) the activity the passenger was engaged in, (2) the passenger's location, and (3) the control of the airline over the passenger, all at the time of the accident." *Adelson v. Am. Airlines, Inc.*, No. C 17-00548 WHA, 2017 WL 3215357, at *1 (N.D. Cal. July 28, 2017) (citing *Maugnie*, 549 F.2d at 1262; additional citation omitted). Courts have also considered, under the totality of the circumstances, whether the passenger had completed any other pre-boarding tasks, such as receiving a boarding pass or checking luggage, and whether the plaintiffs were imminently preparing to board the airplane. *Compare Schmidkunz*, 628 F.2d at 1207 (9th Cir. 1980) (passenger was not in process of embarkation when passenger injured herself on a moving walkway where passenger "had left the airplane on which she had arrived in Copenhagen, had walked not closer than approximately 500 yards from the boarding gate to the SAS airliner that she was to take," was in a common area of terminal, did not have her boarding pass, was not imminently boarding the plane, and was not under control of SAS personnel at the time of her injury) *with Day v. Trans World Airlines, Inc.*, 528

United States District Court
Northern District of California

F.2d 31, 33 (2d Cir. 1975) (passengers who were injured in terrorist attack were in process of embarking when, at time of the attack, "the plaintiffs had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal. They were required to stand in line at the direction of TWA's agents for the purpose of undergoing a weapons search which was a prerequisite to boarding."). "Most courts have concluded that 'embarking' requires a close temporal and physical connection to the actual boarding of an airline flight." *Kalantar v. Lufthansa German Airlines*, 276 F. Supp. 2d 5, 10–12 (D.D.C. 2003) (discussing cases).

Lufthansa argues that "[a]ll of Plaintiffs' claims arose during the course of their 'international carriage' or during the process of embarking or disembarking, and are thus exclusively governed by the Montreal Convention." Opp'n at 6. Lufthansa specifically identifies allegations that plaintiffs were interacting with Lufthansa personnel at the Lufthansa check-in desk or in the Lufthansa office when Doe and Jamshed were submitting the required documentation to Lufthansa headquarters in Germany. *Id.* at 5–6. Lufthansa contends that these allegations show that plaintiffs were in Lufthansa-controlled areas of the airport, and that Lufthansa controlled plaintiffs' actions, for example by holding Doe in the Lufthansa office while documents were transmitted to Germany. *Id.*

In response, plaintiffs argue that their claims arise from conduct prior to the operations of embarking, and they emphasize that they were initially prevented from checking in. Reply at 4–13. For example, "the incident with Jamshed took place in the public area of the airport" and "far away from the embarkation gate . . . while there was still considerable time before boarding." *Id.* at 12–13; *id.* at 13 ("[N]ot even the first of the numerous steps required preliminary to boarding, and therefore 'embarkation,' had occurred."); Dkt. No. 64-1 (Doe Decl.) ¶ 3 ("Plaintiff Robert Roe and I were not allowed to check-in, no boarding passes were issued to us, and our baggage was not accepted for travel. It was in this public area, after Roe and I were not allowed to check-in, that Mr. Roe attempted to discretely speak with Jamshed . . . ."). Doe also describes the layout of the King Khalid International Airport as of May 25, 2021:

9

> [I]n the public area of KKIA were rows of counters, with specific numbered desks in each row allocated to different airlines. Only those desks were in the control of each airline, including Lufthansa, and were where passengers were checked-in, boarding passes provided and their baggage accepted. The remainder of the space was entirely public, in which members of the public were free to congregate or come and go as they pleased. Even after check-in, passengers could come and go as they pleased.
>
> ***
>
> [T]he departure gates at KKIA were separated from the check-in counters, and could not be reached without passing through the KKIA security check and passport control, which also required that valid boarding passes be presented. The departure gates at KKIA once again were a public area in which ticketed passengers who had passed through security and passport control congregated freely, and could come and go until they presented their boarding passes and were allowed to embark on the aircraft.

Doe Decl. ¶¶ 3–4; *see id.*, Ex. A (undated photos of the check-in counters at King Khalid International Airport). Doe further declares that neither he nor Roe was detained at the Lufthansa office:

> When I went with Jamshed to the separate Lufthansa office where he attempted to and eventually reached the Lufthansa station manager by phone, and where he also telephoned Germany to determine if he should allow Plaintiff Roe and I to check-in and take our scheduled flight, I was not locked in, physically restrained or otherwise detained. There was no security present. I knew I could have left and that Plaintiff Roe and I in theory could have abandoned our attempt to fly to California and simply stayed in Saudi Arabia.

*Id.* ¶ 5.

Given fact intensive nature of the inquiry and the early stage of the proceedings, it is premature to determine whether the Montreal Convention preempts plaintiffs' claims.[4]   *See Schmidkunz*, 628 F.2d at 1207; *Acevedo-Reinoso v. Iberia Lineas Aereas de Espana S.A.*, 449 F.3d 7, 12 (1st Cir. 2006) ("[T]he question [of] whether a passenger's injury was sustained 'on board the aircraft or in the course of any of the operations of embarking or disembarking,' Convention art. 17, 'is a question of law to be decided by the court' based on the facts of each case, *Marotte v. Am. Airlines, Inc.*, 296 F.3d 1255, 1259 (11th Cir. 2002)); *Kalantar*, 276 F. Supp. 2d at 10–12; *McCubbins v. United Airlines, Inc.*, 227 F. Supp. 3d 654, 658 n.1 (S.D. Miss. 2016) (The "terms ['embarking and debarking'] are found in Article 17 of the Montreal Convention, but their meaning

---

[4] Although plaintiffs offer the Doe Declaration to show that the Lufthansa check-in counter at the King Khalid International Airport is in a public area, Lufthansa is entitled to rebut such evidence before the Court makes any findings regarding preemption.

has produced a complicated, fact-specific, and often inconsistent body of law."); *see also Adelson*, 2017 WL 3215357, at *2 ("[P]laintiff is reasonably close to alleging facts that meet the three elements of embarking under the Montreal Convention. British Airways, not plaintiff, is in possession of the facts necessary to determine if plaintiff was in the process of embarkation and it would be unfair to expect plaintiff to plead facts held in secrecy by British Airways. Under the specific facts of this case, plaintiff is entitled to those secrets to prove facts and circumstances necessary to establish embarkation."). Rather, this issue is more appropriately resolved after the factual record has been developed.[5]

## II.     Prejudice

Lufthansa argues the Court should deny amendment because the proposed FAC's allegations regarding Lufthansa's alleged history with the Nazi party and of past racism and anti-Semitism are not relevant and unduly prejudicial. Opp'n at 16 (citing Proposed FAC ¶¶ 9, 48–55, 57–65, fns. 3–6). In particular, Lufthansa argues that these "highly inflammatory" allegations will "(a) taint the finder of fact with derogatory character implications unrelated to the elements of Plaintiffs' claims, (b) expand discovery into collateral issues concerning character and unrelated incidents, and (c) divert the litigation from the merits to disputes over reputation and motive that have no bearing on liability or damages." *Id.* Plaintiffs counter that this is not a basis to deny amendment and, in any event, such allegations "have been proffered for a legitimate litigation purpose" of showing "a pattern and practice of refusing to acknowledge and take responsibility for patently discriminatory and outrageous conduct by its staff and managers." Reply at 13–15.

"Prejudice to the opposing party is the most important factor" under Rule 15(a). *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). "'The party opposing amendment bears the burden of showing prejudice.'" *Srigley v. Monterey Peninsula Yacht Club, Inc.*, 748 F. Supp. 3d 801, 804 (N.D. Cal. 2024) (quoting *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir.

_____

[5] As it is premature to determine whether the Montreal Convention applies, the Court does not address Lufthansa's argument that the Court lacks subject matter jurisdiction under Article 33 of the Convention. *See* Opp'n at 13–15.

United States District Court
Northern District of California

1987)).  To overcome Rule 15(a)'s liberal policy favoring leave, the prejudice to the opposing party must be "substantial."  *Genentech, Inc. v. Abbott Lab'ys*, 127 F.R.D. 529, 530–31 (N.D. Cal. 1989).  For example, a need to "reopen discovery and therefore delay the proceedings" may suffice to establish prejudice.  *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999).  Amendment may also be prejudicial if it "would unnecessarily increase costs or would diminish the opposing party's ability to respond to the amended pleading."  *Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F. Supp. 2d 1160, 1177 (E.D. Cal. 2013) (*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).  Further, the addition of an "independent claim" that catches the opposing party off guard after dispositive motions have been filed may also suffice to establish prejudice even if "it is not clear that additional discovery would be required."  *Del Valle v. Cnty. of Sonoma*, No. 17-CV-03611-JSW, 2019 WL 10733250, at *6 (N.D. Cal. Feb. 20, 2019), *aff'd in part, rev'd in part and remanded sub nom. Del Valle v. Thorne*, 790 F. App'x 868 (9th Cir. 2020).  But when discovery is ongoing and there is no unfair surprise, "neither delay resulting from the proposed amendment nor the prospect of additional discovery needed by the non-moving party in itself constitutes a sufficient showing of prejudice."  *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, No. C 06-3359 JF (RS), 2009 WL 667171, at *2 (N.D. Cal. Mar. 10, 2009).

Lufthansa has not met its burden of showing that amendment would cause it substantial prejudice.  The case is still in early stages, and the Court has yet to set discovery and other pretrial deadlines.  Lufthansa will therefore have ample time to investigate the new allegations.[6]  Lufthansa also has not shown that the new allegations will unnecessarily increase costs or prevent it from responding to the proposed FAC.  If Lufthansa contends that its alleged history is irrelevant to the claims and defenses or not proportional to the needs of the case, it can assert such objections during discovery.  To the extent Lufthansa is concerned about prejudicing the finder of fact, Lufthansa can move *in limine*, as appropriate, to exclude evidence of its alleged history.

---

[6] This case has only recently returned to this Court.  Although the Ninth Circuit issued its opinion on October 30, 2025, the mandate did not issue until March 3, 2026.  Dkt. Nos. 55, 60.  In addition, the parties' February 20, 2026 joint status report does not state whether the parties have commenced fact discovery.  *See* Dkt. No. 58.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court GRANTS plaintiffs' motion. Plaintiffs shall file their FAC no later than **May 1, 2026**.

The Court also schedules a further case management conference on **June 12, 2026 at 3:00 p.m.** The parties shall file a joint case management conference statement by **June 5, 2026**.

**IT IS SO ORDERED**.

Dated:   April 28, 2026

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

13